Chief Justice Marshall
delivered the opinion of the Court.
On the 16th day of September, 1848, Gen. James Taylor of Newport, conveyed to W. J. Berry as trustee about forty-three acres of land “to him and his heirs and assigns forever in trust,” for the uses and purposes following:
1. To survey and lay off the same into lots, streets and alleys as an addition to the town of -Newport, and to sell the same at.public or private sale“as soon and on such terms as may be deemed the most expedient.
2. To invest the funds arising from such sales in such productive property in Cincinnatti, Newport, or Covington, as my daughters Keturah L. Harris, 'Ann W. Tibbatts, and Jane Williamson, may desire to have purchased, each of them to have the direction of the investment of one third of said funds; and to convey or cause to be conveyed to them, (that is to say one-third to each,) the property iii which investments may be made, to have and to hold the same and the rents* issues, and profits thereof, to each of them during their respective lives, and the remainder to the heirs of my said daughters respectively, after their respective deaths.
3. If any of my said daughters should wish to retain their or any portion of their interests in said land, and not to sell the same at the time said trustee may wish to sell the same, the said trustee is directed to make a a fair and equitable division of said lots . amongst my said daughters, and to sell the same at such time as thejr may respectively direct, or to convey the same to each *246 of them respectively — to have and to hold the same during their natural lives respectively, with remainder to their respective heirs, after their respective deaths.
Second deed oí trust by Taylor to Berry.
Another writing giving dhections to the Trustee.
4. To retain out of the moneys arising out of any sales an amount sufficient to cover the expenses arising out of the execution of the aforesaid trusts, and a just and fair compensation for his services in the premises.”
On the 17th of October, 1848, the same grantor executed to the same trustee a second deed conveying to him in fee simple and in trust, a smaller tract of land, (understood to contain over twenty acres,) which also, as we understand, adjoined the town of Newport and the tract conveyed by the first deed. The trusts declared in this deed are as follows:
“ First, to lay off said land into lots, streets, and alleys, as an addition to the town of Newport, and to sell the same at public or private sale as soon and on such terms as may be deemed the most expedient.
Second. To divide the funds arising from such sales (after retaining an amount sufficient to cover expenses and a reasonable compensation for his services,) equally between my daughters, Keturah L. Harris, Ann W. Tibbatts, and Jane Williamson.”
On the same 17th day of October, 1848, the grantor executed a writing under his hand and seal directing the trustee to pay over to his three daughters, one-third part of the proceeds of sales under the first deed, “that is to say to each one-ninth of the whole sales, instead of investing the same as therein directed. But in order to preserve the fund entire, which is intended to be created by said (the first,) deed of trust, he is to refund the moneys above directed to be paid over, from the proceeds of the sales of lots included in another deed of trust executed to him of this date.” Each of these instruments was recorded upon due proof or acknowledgment a few days after its date.
The action of the Trustee.
The trustee appears to have proceeded immediately to lay off the land conveyed by the two deeds into lots, streets, and alleys, as an addition to the town of Newport, under the name of the Buena Vista addition. And on the 5th day of November, 1848, a deed was duly executed and afterwards duly recorded between Harris and wife, Tibbatts and wife, and Williamson and wife, allotting to the females respectively (they being the three daughters named in said deeds,) certain lots by number in said Buena Vista addition to the town of Newport, but leaving other lots undivided. This deed states that in conformity with the provisions of the two deeds of trust, which are particularly referred to, the following division of lots, &c., has been made, that the lots are accordingly to be sold under the direction of the parties respectively, according to said division and allotment, so far as said directions are consistent with the provisions and intent of the deeds above mentioned; and that the funds arising from the same are to be invested or paid over to the parties according to the provisions of said deeds and another writing da. ted 17th day of October 1848, and recorded in Deed book folio. At the foot of this deed is the following writing, signed by the trustee: “I concur in and confirm the above division and allotment.”
The ‘other writing’ referred to in this deed is the same by which as above stated, the trustee is directed to pay over one-third of the proceeds of sales under the-first deed, and to replace the amount from the proceeds of sales under the second deed. This change in the direction of the fund under the two deeds is therefore ratified and confirmed by the parties to the partition deed so far as they are concerned. And indeed it appears by the evidence, that it was made at the suggestion of one and for the benefit of all three of the beneficiaries, as a means of supplying them more speedily with money, and because the land included in the first deed was deemed more valuable and more saleable than that included in the second.
Note ofWilliamson and wife to the Trustee.
Truslee’sanswer thereto.
Filing bill by Williamson and wife.
After the execution of this deed of partition, a number of lots were sold publicly, and many were sold privately without any disagreement so far as appears, between the ti'ustee and the beneficiaries or their husbands, with regard to the execution of the trust, or any attempt to prohibit the trustee from making sales, until the 26th of March 1849, when the following note of that date, signed by Geo. T- Williamson and Jane M. Williamson, was addressed to W. J. Berry, trustee:
“ Sir. — Lots No. 231 and 232, in the Buena Yista addition to Newport, have been contracted by myself and husband to John Detsel. On the first payment to you by Detzell, you will make him a bond and take'his notes. And lots 267 and 268, have been sold by us to Jacob Fister. On the first payment to you, make him a bond, and take his notes. You are referred to the 3d section of the deed of trust for directions as to our right of directing the time of sales. You will not sell till directed, any lots divided to me.”
On the same day Berry returned to this note, the following answer:
“ Geo. T. Wileiamson, Esq. Bear Sir. — Your most extraordinary note was handed to me this morning by Mr. Detzell. It appears to me you take too much for granted. I deny altogether your right to sell and issue bonds for lots in the Buena Yista addition. That right is expressly delegated to me by the deed of trust under which I act. If cousin Jane Williamson is unwilling that her lots shall be sold at this time, and will notify me of that fact I will regard her wishes.”
On the next day, the 27th of March 1849, Williamson and wife, filed their bill making Berry, Harris and wife, and Tibbatts and wife, defendants, and praying upon charges hereafter to be noticed' — that Berry be enjoined from further sales, collections, &c., as to their interest, and from executing bonds or deeds without their written consent. And that he be removed from the office of trustee, and compelled to make a full set *249 tlcment, with the allowance of such compensation as his fidelity may demand.
Note by Jane Williamson to Trustee, andalso the note of (j. T. Williamson.
Trustee’s answes to Williamspn.
On the 9th of May 1849, before any of the parties had answered this bill, Berry received the following note signed Jane M. Williamson:
“ W. J. Berry, trustee. — You will convey to me all the lots in the Buena Yista addition to Newport, Ky., lying in the bounds of the second deed of trust from my father, Gen. James Taylor, which have been allotted to me in division, and now belonging to me.”
Before answering this note he received the following, signed Geo. T. Williamson, and dated May 2Lst 1849:
“W. J. Berry, trustee. Sir: You gave me your word that on Saturday by 12 o’clock, I should have your answer as to whether you would convey as Mrs. Williamson ordered you to do, or not. No such answer has been given. You will send by Henry your determination, and let it be closed one way or the other without any further delay.
“ P. S. If you decline send me back my letter, the order of Mrs. Williamson, and the deed, with a statement signed by you that you will not comply.”
Berry in his answer, addressed to G. T. Williamson, says: *250 to write them in a different tone and style from the one on the other side of this page, otherwise they will remain unanswered.
*249 “Sir: After due consideration., I decline making thé conveyance you demand, and for the following reasons: 1st, Because I conceive that I am morally and legally bound to cany out the intention of Gen. Taylor in making the trust. That intention was, I understand, to secure the property conveyed to his daughters and their children, and to place it beyond the power and control of their husbands. To make the conveyance you require would clearly defeat that intention, and would be a violation on my part of the trust and confidence reposed in me, and therefore I have resolved not to accede to y.our wishes; and permit me very respectfully to suggest, that should you have any future communications to make to me, it will be as well
. Filing second bill by Williamson and wife.
Demurrer of Trustee to the bills, and overruled, and answer of Trustee.
“ P. S- The deed and order you wish returned are not in the office at this time. I will send them to you the first opportunity.”
The deed sent for execution by Berry is not in the record.
On the 34th of May, within two or three days after the reception of this anfewer, Williamson and wife filed against the same parties before, a second bill, (after-wards consolidated with the first,) in which after setting out this last correspondence as evidencing on their part the election of Mrs. Williamson to take the title to her lots in fee simple, rather than to take the proceeds, and expressing their discontent with the office of trustee and with the trustee himself, with the necessity of compensating him as he may demand for signing deeds, and with the control usurped by him, and denying his right to sit in judgment on the intention of Gen. Taylor in the trust deeds, they pray for an injunction and settlement as before, and for a conveyance in fee simple to Mrs. Williamson, of all the unsold lots assigned to her in the partition.
Berry demurred to each of the bills and upon his demurrers being overruled, filed answers in which admitting the correspondence referred to, and denying the general allegations tending to show his violation of the trust or unfitness for the office, he refers the construction of the deeds to the Court, professes his willingness and desire to act in conformity with his duty, and to exhibit his books at the direction of the Court, and refers to a full statement of his accounts and acts as trustee, as an exhibit, which however was not filed until a subsequent period. He denies the propriety of requiring security from him as proposed, or of calling for an exhibition of his accounts until a breach of duty is shown, or of removing him from the trusteeship.
Answer of Tib. batís and wife.
Answer of Harris and wife — satisfied with acts of Trustee.
Tibbatts and wife answered, concurring substantially with the views and prayers of the complainants, and making additional charges against the trustee. They exhibit a written request from themselves to the trustee that he should deliver to their agent the money and notes in his hands for sale of lots-assigned to Mi's. Tibbatts in the partition, reserving out of the notes having longest to run till due, enough to make up advances to her from proceeds of lots in the first deed, to convey to said agent upon the trusts specified in the' first deed, the unsold lots .therein conveyed, which -had .been assigned to Mrs. Tibbatts, and to convey to her in fee simple the unsold lots which had been assigned to her within the boundaries of the second deed; and allege his refusal. But they do not make their answer a cross bill, and its charges were not answered by Berry.
Harris and wife answered expressing satisfaction with the trustee and his manner ’of administering the trust.
It appears from the pleadings that the'entire value of the trust propei’ty amounted probably to between two- and three hundred thousand dollars, that many of the lots had been sold privately, the sales having been negotiated in many instances by the beneficiaries or their husbands, and in others by the trustee, and that considerable sums had been paid to the beneficiaries in money and sale notes, that Gen. Taylor after his son had refused to accept the trust intended to be created in this property, fixed upon Berry, a young relation of slender means, who had been in his employment as a clerk, as one whom he deemed competent and faithful, and whose interests he desired to promote by giving him employment and compensation, not only for the reasons above staded, but because his father, also a relation, had served him essentially in the management of his large estate, and as already observed, no dissension or dissatisfaction seems to have occurred with respect to-the management of this trust prior to the date of the correspondence of March 1849, which was the imme *252 díate cause of this suit. It appears however, that there was before that time, some dissatisfaction on the part of Williamson and Tibbatts, with the conduct of Berry in prosecuting as a trustee under Gen. Taylor’s will, a writ of error to the order of the County Court rejecting it, and this feeling may have had its influence in producing the disagreements which afterwards occurred. Be this as it may, there is considerable asperity of temper and expression displayed in the pleadings commenced by the complaining parties, and reciprocated or retorted by Berry in repelling their charges. The evidence shows that in the subsequent intercourse' between the trustee and the dissatisfied beneficiaries, each party insisted on rights which the other denied, and each conceived that the other was guilty of actual or intended encroachment or usurpation. The trustee as is evident from his response to Williamson, seems to have considered it as his duty and right to protect the interest of the beneficiaries against the acts of their husbands, and therefore yielded reluctantly and sometimes not at all, to transactions apparently intended for the benefit of the latter, while the husband manifestly restive and discontented under the restrictions under which the property was held, considered the trustee as not being sufficiently prompt in meeting their desires or confirming their acts in disposing of the property, and charge him with being disregardful of the interest of the beneficiaries, dilatory, obstinate, capricious, arrogant, arbitrary, and tyrannical.
No occurrence, of an unpleasant nature seems to have taken place in the personal intercourse between the trustee and Tibbatts and his wife, the business between whom was generally transacted through an agent, the brother and clerk of Tibbatts. But they make the general charges first stated and complain of delay, and want of accommodation, and in some instances of a refusal of Berry to carry out sales made, by them, and charge that he holds on to the trust against the wishes of the beireficiaries from mercenary mo *253 tives, charging commission (of 5 per cent,) upon sales made by Tibbatts, and in order .to justify the charge refusing to execute deeds presented by their agent, and executing precisely similar deeds made out by himself, and in one or more instances charging said commission, when the lot had been taken in payment of a debt due from Tibbatts. A considerable portion of the evidence relates to facts of the character referred to in these char'ges.
The object of the bill and grounds of relie! statedr
The bills of Williamson and wife, besides making general charges of the character above noticed, charge an improper disposition of the trust funds, and inability in the trustee to make up any deficiency, and a consequent danger of the fund. Also a neglect on his part ‘to make investments as directed by the- first deed, and a neglect to give Mrs-. Williamson by a statement of her account or otherwise, such , information .as would enable her to. direct an investment, &c. No fact justifying 'these charges is shown to have existed prior to the filing of the first bill, unless it .be that Berry deposited the proceeds- of the trust property in Bank in his own name individually. During the progress of the suit and after the answer of Berry promising a detailed statement of his accounts and ti-ansactions in the trust was filed, Williamson seems to have asked for an account which was not rendei’ed, ■ It also appea2-s that upon an order from Mrs. Williamson for payment of funds belonging to her, Beny paid a certain sum and took a receipt therefor; and that Williamson upon finding that the money was paid as due under the second deed, when the order required what was due under both deeds, demanded a change in the receipt or a cancelment of the payment-by a mutual surrender of the order and the money, which Beny refused. • On each of these occasions some wannth of feeling was displayed by the parties. It ap^ear’s further that a purchase of a house, &c., in Cincinnati, was negotiated by or for Mrs. Williamson,' to be consummated by Berry as trustee, and it seems from the evidence that the tnistee *254 was considered as having unreasonably delayed to close this transaction, at the hazard of losing the bargain which'was advantageous.' On the other hand the deed as first presented for his approval seems to have conveyed the property to Mrs. Williamson in fee simple, and in the requisition for payment the trustee was required to surrender to the purchaser receipts from Mrs. Williamson-for funds paid to her under the trust deeds,, and it does not appear in what form precisely the conveyance was finally made, though probably in the words of the 8th clause of the first deed of trust.
Report of Commissioners appointed to consult femes covert concerning their suits.
These are the only transactions proved as between the trustee and Williamson and wife, during the pendency of the suit.
Before the hearing the Court appointed two Commissioners to ascertain from Mrs. Williamson and Mrs. Tibbatts by examination apart from their husbands, whether t-hey were satisfied with the conduct of the trustee, and whether they desired his removal, what disposition they desired to be made of the trust funds in his hands and of the trust property unsold, and whether they approved of the prosecution of this suit in their names. Their report showed that the, two femes expressed great dissatisfaction with the conduct of the trustee with respect to, the trust, and earnestly desired his removal, that they desired the trust funds in his hands to be deposited in a safe bank, subject to their order or to be invested in productive real estate such as they should order. And that they desired the property conveyed by the second deed of trust to be conveyed to them directly by order of the Court, the portion of Mrs. Tibbatts under the first deed to be conveyed to L. Tibbatts, as her trustee, and that of Mrs. Williamson to be conveyed either to E. L. Southgate, or one of two others named, and they stated that they entertained no ill will towards the trustee but thought him in no wise suited to the trust.
The decree of the Circuit Court. Decision on demurrer to bills sustained.
'On the hearing the Court by a decree apparently founded, not upon any conviction .that the trustee had .acted unfaithfully, or in violation .of the trust reposed in him, but upon the conclusion that he. and the dissatisfied beneficiaries differed in opinion as to their .respective rights, and that the business could not be conducted harmoniously between them. And without determining the respective rights of the parties with respect to sales, conveyances, and commissions, or ascertaining what advances had been made to the respective beneficiaries from the proceeds of sales under the first deed, decreed a conveyance to Mrs. Williamson and Mrs. Tibbatts respectively, of their respective portions of the land included in the second deed, and decreed that the unsold lots assigned to them respectively under the first deed should be conveyed, the portion ol"'Mrs. Williamson to E. L. Southgate, and that of Mrs. Tibbatts to L. Tibbatts, in trust to be held by them respectively, precisely as held by Berry under the deed of Gen. Taylor; the deeds to be made On or before the first day of the next term, using the same language as .in the original deed of Gen. Taylor, and no discrimination seems to be made between the divided and the undivided portions. The trustee thus removed was enjoined from further acting with respect to these two interests except in making said deeds, but was not removed as to the interest of Mrs. Harris. He was directed to deliver into Court all notes and money in hand for lots sold, with his report on the first day of the next term. A Commissioner was directed to ascertain and report the compensation proper for the removed trustee, and also to report at the next term the lots sold and money and notes received under the trust, &c., so as to show the accounts of the three daughters, and of each separately, but he is not directed to discriminate between the lots-sold and unsold in the two deeds. The question of costs was reserved.
Hasbanrt & wife may unite in a suit to recover 1hat. which is for the separate use of the wife.
The grounds assumed by complainant & wife, and Tibbatts and wife, for relief.
It is now contended that the bill should have been dismissed on the demurrer, 1st, because there was a misjoinder of parties, Williamson having been improperly joined as a co-complainant with his wife. And 2d, because the bill shows no equitable ground for the interposition of the Court. We think each of these grounds is untenable. The deed does not create a separate estate in either of the grantor’s daughters, but only puts the legal title in a trustee in trust to a certain extent for their use, without any expression of exclusive use. The doctrine and cases1 referred to with respect to the manner in which a feme covert should sue for her separate property are therefore inapplicable. And even if this were a suit concerning separate property and if it were conceded that the wife must in such case sue by her next friend, and not with her husband, still it would seem, more reasonable that the form of the suit should be changed and the husband made a defendant, than' that the bill should be dismissed on demurrer. We are inclined to think however, that even jn qase of a separate estate the strict rule insisted on' has not been adhered to in Kentucky, and at any rate jt does not apply to this case.
As to the second ground, it is sufficient to say that the bills charge a misappropriation of the trust funds, sales of the trust property in opposition to the directions of the beneficiaries as authorized by the deeds, a neglect to invest the proceeds, or to give account of them, and,such violations of the trust in’these and other particulars as at least required an answer. And if proved would have required relief of some sort. They also showed.inconsistent claims of right-’by the respective parties which the Court might well be called on ,to settle.
Thé most important questions made .in discussing the merits of the case, arise upon the construction and effect of the two deeds, and the writing bearing even date with the last, which must separately or together determine the rights and duties of the parties. It is contended on the part of the beneficiaries that as the pro *257 ceeds of the lots included in the second deed, are directed to be paid to them absolutely, they may elect to have the land itself instead of its proceeds. And 'that as they may also by express authority of the first deed elect to have the lots in that deed conveyed to them, “to have and to hold to them during their natural lives, with .remainder, &c., to their heirs,” they may by electing such a conveyance, invest themselves at their option with a title which, according to the rule in Shelly’s case, will place the fee simple in them, or that even if that rule should not be regarded as authoritative in Kentucky, it is shown to be a,rule of law in Ohio, and as these beneficiaries may elect to have the proceeds of these lots invested in lands in Ohio, (Cincinnati,) to be conveyed in like manner, they should be regarded as having potentially the absolute interest and control of the trust property conveyed' by the first deed. The conclusion founded on these positions, is, first, that as the beneficiaries have thus the right to require the trustee to divest himself of the legal title and ’ invest it in them, whereby the trust must at their mere option be wholly terminated, he has no right to complain that at their option and by the Court’s decree he has been required to convey the title to them or to other trustees for them, and has been thus divested of his powers and title. And second, that as the entire interest in the subject of the trust is thus virtually or potentially, if not actually in the daughters of the grantor, their children or heirs having no interest are not necessary parties to this contest with the trustee; and it is further argued that even if an interest is secured to the heirs of the daughters, they have no heirs until their death, or their heirs cannot be previously ascertained, and therefore there can be no necessity for making-any persons parties as their hems.
The essence of the enquiry involved in this argument is, whether the first deed secures- any interest to the heirs of the grantor’s daughters. This question has been elaborately discussed in this Court; as it sefefns also to have been in the Circuit Court with reference to *258 'the autborily-of the rule in Shelly’s case, and to the distinction between trusts executed, and-executory, and to the question whether that distinction is material in determining the application of that rule where it is authoritative. Where the trust is executed, as where an estate is conveyed to A and his heirs, to hold in trust for B for life, and afterwards for the heirs of B, or with remainder to the heirs of B, the English cases almost without exception regard the trust as executed, and decide that the equitable estate being subject to the same rules as if it were a legal estate, the remainder intended for the heirs of B, vests in B himself by operation of law, and thus enlarges his estate into a fee simple. But in this case the land is conveyed to the trustee, not to hold the title for the use of the daughters then of their heirs, but for the purpose, 1st, out into lots and selling them and investing in other lands of their selection, which ¿¿conveyed to them respectively “to have and to hold to them respectively during their respective lives •wh£t '■Remainder afterwards to their respectiveheirs,” or 2d,¿after the lots are laid out, he is at the option of either of the daughters to convey to her her portion or any part of it, to have and to hold during her life, with remainder to her heirs. It is as we think manifest that this deed does not invest the beneficiaries with any direct interest legal or equitable, in the land itself which is conveyed by it, nor even in the proceeds which may arise from its sale by the trustee, but in case of sale only confers upon them the right or power not of receiving the fund themselves, which is absolutely directed to be invented in other property, but merely to direct in what particular property of the kind indicated by the deed, the investments shall be made, and requires the same to be conveyed to them to have and to hold, &c. There is surely no reasonable ground for questioning that so far the trust requiring so many acts to he done by the trustee before the cestui que trusts can derive any benefit from it is executory and not executed. And in *259 carrying it into final execution by securing to the beneficiaries the-benefit actually intended-for them, it would seem a Court of equity should regard and effectuate that intention so far as may be done consistently with the rules of law. But the deed goes on to give to the beneficiaries severally as far as each is interested the option and therefore the right or" power to dispense with these intermediate acts oí sale, investment, &c., and to require her portion of the land -conveyed by the deed to be conveyed to her to have and to hold as directed. This however is not the disposition prescribed or (as may be assumed,) preferred by the grantor, but a mere power to change that disposition. And such a power until exercised leaves the duties of the trasteé and disposition of the trust property, and consequ character of the trust, to be determined by tí clause and the primary intention and directi grantor as therein expressed, subject only to eise of the power of changing the direction ofiltfoepron erty which may at any time remain unsold. l%s be the case even if the last clause empowered t ficiarv to cause the conveyance of the unsold property' ’ to be made to herself in fee. The mere power to change the'direction primarily given to the property by the-grantor having full dominion over it, does not ipso factonor until exercised, or at least until the election to exercise it is manifested, invest the donee of the- power with-any estate either legal or equitable i-n the property itself. Then even under the last clause the trust cannot be regarded as executed because this clause gives no-estate but only a power, and is of no efficacy whatever' in giving an estate or interest legal or equitable, except through the exercise of the power or election, andeventhen it does not on terms pass any designated estate legal or equitable to the beneficiary but requires a conveyance by the trustee, to put in the beneficiary the estate which the grantor intended her in that case to have. And as under this clause the intermediate- acts of election on the part of the beneficiary and division *260 and conveyance on the part of the trustee, are ísequíred in order to invest in the beneficiary the interest intended, the trust under this claim must in our view be regarded as being also executory, and therefore to be executed according to the intention of the grantor.
Land was conveyed to a trustee to be by him laid off info lots and sold, & the proceeds invested in lands to be select’d by cestui que trusts, and to be held by them respectively during their lives, with remainder to their heirs respectively, gives the cestui que trust no interest in the laud to be laid off. The trust is executory
Bistinotionbefn' ana executory,
The cases go even farther than this, and it has been repeatedly decided by Courts of the highest respectability,- that when the legal title is placed in a trustee with absolute directions to convey it to the beneficiaries, or to convey it at a certain time, the trust is executory though the trustee has only to make the conveyance; and that in such cases-, the Chancellor in executing the trust will direct the conveyance to be made so as to effectuate the intention manifested in the instrument creating the trust. Some of these cases are stated in Fearne on remainder, from- page 114 to 121. Chancellor Kent in his commentaries, vol. 4, p 305, 2d ed., after stating that trusts are óf two kinds executory or executed, defines and distinguishes the 'two classes in the following terms : “ A trust is executory when it is to be perfected at a future period by a conveyance or settlement, as in the case of a conveyance to B in trust to convey to C. It is- executed either when the legal estate passes, as in a conveyance to B in trustor for the use of C; or when only the equitable title passes, as in the case of a conveyance to B for the use of C in trust for D. The trust in the last case is executed in D, though he has not the legal estate.” In a preceding page, 2d ed. 303-4, he. says: “But though equity follows the law,-and applies the doctrines appertaining to legal estates to trusts, yet in the exercise of chancery jurisdiction over executory trusts, the Court doés not hold itself strictly bound by the technical rules of law, but takes a wider range and more liberal view in favor of the Intention of the parties.” And in page 218 of the same volume, the same doctrine is more fully expressed. Judge Story in his treatise on Equity Jurisprudence, sec. 1066 and 974, recognizes, but in more qualified terms, the distinction here referred to in *261 the construction of words in- the cases of executory and executed trusts. And in the chapter on marriage settlements, after stating in section 983, the liberality of construction extended to marriage articles in furtherance of the intention. He says that in cases of ex-ecutory trusts in wills, a similar favorable interpretation will be made in carrying them into effect, if the Court can clearly see from the terms of the will, that the intention of the testator is to protect the interests of the issue in the same way. But in the following section he states and seems to adopt a distinction as applicable to the construction and execution of executory trusts created in marriage articles, where an intention in favor of the issue of the marriage is presumed, and of such trusts created in wills, where all the parties take by the mere bounty of the testator, who has a right arbitrarily to give what estate he pleases to the parent or to the issue, and whose gift therefore, should be measured by the words in which it is made. So that if the words in marriage articles direct an estate for life to the father with remainder to the heirs of his body, Courts of equity well decree a strict settlement in conformity with the presumed intention. But if the like words occur in executory trusts created by will,, it is said there is no ground for Courts of Equity to decree the execution of them in strict settlement, unless-the words occur explanatory of the intent. But when the trust is clearly executory, and is to- be, executed under the direction of a Court of equity, the fact that the-benefit intended to result from the trust is the merely voluntary donation of the grantor, seems wholly insufficient to authorize the Chancellor to disregard his intention, and to adopt a rule of construction, or to subject it to a rule of law applicable to legál estates, by which it will be defeated.
Rule in Shelly’s1 ease defined— Held not to apply as a rule of construction ior determining the-intention of a party in limiting an estate in the creation of a trust upon it.
*261 The rule in Shelly’s case is not a rule of construction for ascertaining or effectuating the intention of the party in limiting an estate or in creating trusts upon it, but is a positive and rigid rule, the chief operation of *262 which is to defeat the ascertained intention of the grantor, since it only applies to a case where according to that intention an estate for life is given to one, with a remainder mediate or immediate to his heirs general or special. And it unites the remainder given to the heirs-with the life estate in the ancestor, not because this' was intended by the grantor, but because by the rule itself the heirs in such a case cannot take by purchase under the designation, but must take by descent from-the ancestor, who must therefore have the inheritance in him. And this rule prevails in instruments passing an estate, unless it is shown by other words in the instrument that the word heirs has been used not in its-legal sense, as embracing the whole line of heirs in succession, but in a restricted sense and as a description of particular persons. If then it be necessary in order to exempt executory trusts from the operation of the rule that other words should show that the word heirs was used in the restricted and not in the technical sense, there is no essentia] difference between the construction of executory and executed trusts, unless it be in the case of marriage articles.
But although there are British adjudications and elementary authorities which thus place executory and executed trusts except incase of marriage articles, on substantially the same footing, and which make a distinction between marriage articles and wills, as stated by Judge Story, there are certainly other British and American authorities which maintain the distinction between the construction of executory and executed trusts as a general one. And which decide that although a devise to A in trust for B, during his life and afterwards for his heirs might like a devise directly to B, for life remainder to his heirs, come within the rule in Shelly’s case, and place the fee in B, a devise of land to A in trust that he will at a designated period convey it to B for his life with remainder to the heirs of B, is a sufficient indication of the intention that A shall have a life estate only, and that the land shall be so conveyed as that B shall *263 'have it for life, and that the remainder shall pass to his heirs on his death.
Where a testator gives instructions merely for making conveyances in trust by the Chancellor, Courts of equity will follow the instructions and execute the trust according to the intention, and the rule in Shelly’s case has no application.
In the cases of Leonard vs Earl of Sussex, (2 Vern., 506,) decided in 1705, Papillon vs Voice, (2 P. Wms. 471,) decided in 1728, and Lord Glenorkxj vs Boswell cases temp. Talbotts, 3; decided in 1733, all upon wills, and which are pretty fully stated by Mr. Fearne (on Rem.,) p. 114, et seq. Although there are in some or all of these cases other words besides those directing the limitation of the estate, from which the intention might be inferred that the first taker should have but an estate for life, and his heirs should take an interest which he could not destroy, these indications have in subsequent cases been held to be of no avail;, and in all of the cases above named, the Chancellors avowed in different forms of expression, the broad principle that because the estate was not executed but executory, therefore the intent and meaning of the testator was to bo pursued. And in the case of Papillon vs Voice, supra, where a direct devise of lands to A for life, remainder to trustees to preserve contingent remainders, and then over to the heirs of the body of A, was construed as giving an estate tail to A under the rule in Shelly’s case, a bequest of £1000 to trustees, to be laid out in land to be settled in the same manner, being held to be an executory trust, was directed to be executed by conveying the land in strict settlement, so as to take it out of the rule. The diversity being as the Court said between a will’s passing a legal estate, and leaving the estate executory, so that the party must come into the Court of Chancery, in order to have the benefit of the will. In each of the cases the Court directed a conveyance, not in the words of the will which would under the rule in Shelly’s case, have defeated the intention, but in such words as would effectuate the intention, and and in all of the cases but one in such words as would make the estate pass according to the literal though not according to the legal effect of the very words used by the testator to express the intended limitation.
*264 The diversity referred .to in the case just mentioned, is thus stated by Chancellor Kent, 4 voi, 218: “When the testator devises the legal estate, he takes upon himself to order the limitations and the rules of íaw will control them. But when the well or settlement is in the light of a set of instructions merely for the purpose of a conveyance to be made by the directions of chancery, a Court of equity will follow the instructions, and execute the trust according to the intention.” The first sentence of this quotation would be more comprehensive and still correct if the word legal were omitted, as the equitable estate when actually created (that is an executed trust.) seems to be subject to the same rules as the legal estate. But to proceed with the cases. In Burnham vs Wood, (6 Page’s ch. rep., 513,) and in Tallman vs Wood, (26 Wendell, 9,) on the same will, (and in perhaps the same case,) the will vested the estate in executors as trustees in trust to divide the same at the end of six yeai;s, among the testator’s children then living and the issue of such as should be then dead, and to be conveyed accordingly, requiring that “in each deed or writing executed to any one of his children, shall also be inserted and expressed, a clause limiting such grant or interest conveyed, to the grantee for life, with remainder over to the right heirs of such grantee, their heirs and assigns forever.”
The question was, whether the conveyances should be so made as to vest in the children a fee simple estate, which at the date of the will they would have had by a conveyance in the words of the will, or whether the children should have but an estate for life, and their heirs should take the estate afterwards in fee. And upon the express ground that the trust was not executed but executory, it was decided by the Chancellor and by the Supreme Court of Errors that it was not within the operation of the rule in Shelly’s case, (which was in force in New York when the will took effect,) and that the testator’s children were entitled to life estates only, and a conveyance was directed accordingly. In the opinion delivered by Chancellor Walworth in this case, *265 {'6 Page, supra,) the authorities both ancient and modern are reviewed, and the'conclusion adopted that they establish the doctrine “that where the trust is merely executory, and something remains to be done to carry into effect the testator’s intention, the Court is not confined to the strict rules of the common .law, but governs itself by the testator’s intention, and does that which will best support it.”
The rule in Shelly's case held not to apply to executory trusts, whether created by deed or will.
Then if it were conceded that the rule in Shelly’s case is in force in this State, we are of opinion.both on the ground of principle and authority, that the trust created by the first deed is in all of its branches executory merely, and that being executory it is exempt from the operation of the rule, and must be executed according to the intention of the grantor, and not in the words used by him, if those words would defeat his intention. There can be no rationalground for distinguishing between an executory trust created by will, and one created by a deed such as this, in which the grantor makes a purely voluntary donation for the bénefit of his own descendants.
Upon the question of intention thus open for enquiry and made the rule for executing the trust, there is not in our opinion the slightest room for doubt. If the grantor had intended his daughters to have the fee simple, it cannot be believed that he would have indicated that intention by directing the land to be conveyed to them, to have and to hold during life with remainder to. their heirs. He was well acquainted with the ordinary form of conveying or expressing a' fee simple title,' and has in both^deeds conveyed the estate to the trustee in that form. He may not have been so well acquainted with the manner of conveying an estate, so as to give it to his daughters for life, and to secure it to their heirs upon their respective deaths. And if he had undertaken to make such a conveyance, he probably would have done it in the manner in which this deed directs it to be done. But if under the rule in Shelly’s case, such a conveyance would have vested the fee in the daughters, it would not have been the less evident that *266 this was contrary to the intention of the grantor, as literally expi’essed in the deed itself. He has not however undertaken to be throughout his own conveyancer or to pass any estate legal or equitable to his daughters, but has only directed it to be done in certain contingencies. And we consider it as being obvious beyond a doubt, that in directing it to be conveyed to them to have and to hold to them during their lives, and the remainder to their heirs, or with remainder to their heirs after their deaths, he intended to direct a conveyance by which his daughters should have the estate during life, and their heirs respectively should have it afterwards. If a conveyance simply to them for life with remainder, to their heirs, would either by the laws of Ohio or Kentucky invest the daughters with the fee simple, and thus annihilate the interest intended to be secured to their heirs, the daughters have no right to demand such conveyance either of the land conveyed to the trustee by the first deed, or of such lands either in Kentucky or Ohio as may be purchased and conveyed under the directions of that deed'. And it was and is the duty of the trustee who is bound to protect the interest of the heirs to see that no such conveyance is made as will destroy their interest and thus defeat the intention of the grantor with respect to the heirs of his daughters. The conveyance in such case should be made to the. daughter for life only, with remainder on her death to such persons as may then be her heirs, to have and to hold the same in such proportions as they would have taken if the same had come to them by descent. And should either of them elect to take a conveyance of.any portion of the land embraced in the first deed, the conveyance must be made in the same way, in order to protect the interest of her heirs.
We proceed then to a consideration of the second deed. And although it were to be conceded that as this deed directs the land conveyed by it to be converted into money and paid over to these beneficiaries in ¿equal portions, they may if the question depended- *267 on this deed alone, have each a right so far as their interests have been separated by partition, to claim a conveyance in fee simple of the land allotted to them, this right is essentially modified by the cotemporaneous writing and the acts done under it. Indeed the first deed as well as the second, is affected by this instrument, which being obligatory upon the present parties by their adoption of it, must as between them operate according to its true intent, and therefore must to a certain extent change the character or rather the direction of the trusts in each deed. It authorizes a diversion of a certain portion of the funds arising under the first deed from the objects therein specified, and an appropriation of them to the purposes of the second deed, requiring on the other hand that the fund thus diverted shall be replaced from the proceeds of the second deed, and thus not only diverts so much of those proceeds from the direction given to them by that deed, but by changing to that extent the object for which this land is to be converted into money, it deprives the beneficiaries to the'same extent of the right to have that land conveyed to themselves in fee, because to that extent the proceeds must go to supply what has been diverted from the objects of the first deed, and must be appropriated according to its directions as if they had been raised from the lands included in it.
The instrument in question authorises the diversion of one third of the entire proceeds under the first deed to the objects of the second, and therein authorizes a diversion from the objects of the second deed of so much of the proceeds raised under it as may be equal to one third of the entire proceeds of sales under the first; and for all that appears the entire value of the land in the second deed may not exceed one third of the entire value of that in the first,, and so as to the portions to which each beneficiary may be entitled; her third under the second deed may not exceed the ninth part of the proceeds raised and to be raised under the first. If the beneficiaries now before the Court were alone to be *268 benefitted by these deeds, -these discriminations might not be so very important, as the question would be whether they should receive the intended benefit in one or another mode. But there are other interests under the first deed which must be protected, - since they arc intended to be secured by that deed. And if under the authority given in the supplemental instrument under notice, the primary beneficiaries may be allowed to subtract from the fund raised under the first deed, the property in the second deed must under the same authority and as matter of justice, be held hound to make' good the sum thus subtracted. And the right of election if it would subsist under the second deed taken separately, is under the joint effect of the three instruments made subservient to the supply of the fund under the first deed to which it is pledged.
If no part of the fund arising under the first deed had been taken under the privilege given by the supplemental instrument, then the election by any one of the beneficiaries to take to herself in fee, one third of the land in the second deed, would necessarily imply a renunciation of the privilege of taking any part of the proceeds of sale under the first deed, since it would be a withdrawal of the entire fund by which the repayment to the trusts of the first deed was to be secured. As an amount not ascertained has been paid over to the beneficiaries from the proceeds of sales under the first deed, the funds in the trustees hands from the second deed or the unsold land therein, or both stand pledged to make up what has thus been abstracted from the first deed, and must so far as is requisite, be applied or remain subject to that purpose, before either of the beneficiaries can properly be allowed to take from the trustee the proceeds of sales made under the second, deed, and the unsold land therein. The trustee cannot be deprived of the means of making good from the second deed the trusts created by the first. And even if a beneficiary might take the unsold land, without a violation of this right, which could only be in case the trustee had suffi *269 cient funds in hand from the second deed to make up the advances from the first, the election'to take the remaining land in the second deed would imply a renunciation of any further advances from the first. This right of election terefore if it exists separately in the several beneficiaries is not absolute, but depends upon the state of their respective accounts for advances from the proceeds of the first deed and upon the sufficiency of the funds in the hands of the trustee arising from their respective portions under the second deed to replace such advances.
Then, although each of the beneficiaries may terminate the trust under the .first deed, as to her portion of the laud therein conveyed and remaining unsold, by electing, to take a conveyance thereof in the manner directed; it is manifest that so far as the land in that deed has been sold, the trust must subsist until the entire proceeds of such sales have been invested as directed by the deed, and this trust binds not only so much of said proceeds as remain in the hands of the trustee, but so much of the proceeds of sales under the second deed and so much of the land thereby conveyed as may be necessary to restore the advances from the first deed.
And as it does not appear that an amount of money equal to the entire proceeds of sales already made under the first deed, has been invested as therein directed, or that the amount received from the portion of either of the beneficiaries has been so invested for her and her heirs, but the contrary is to be assumed, and as moreover it is not alleged and proved that the funds in hand from sales under the second deed are sufficient to replace the advances from the first, either in the aggregate or with reference 'to the separate account and interest of either of the beneficiaries, it is clear not only that the argument in suppoit of the decree on the ground of a right in the beneficiaries to terminate the trust, wholly fails, but that even as to the unsold land in the second deed, the record furnishes no sufficient basis for decreeing a conveyance thereof to the two *270 beneficiaries who have elected to claim it. And we may remark, that to enable them to make such election fairly and understandingly, they should be informed that in electing to take the unsold lands in the second deed, and the funds arising from sales already made under it, even so far as this may be done without injury to the trust declared in the first, they do and must renounce all further right to receive the proceeds of sales under the first deed, retaining only the power of directing investments so far as sales may at any time have been made, and of directing when future sales shall be made and of having their respective portions of the unsold land conveyed so as to be held by themselves for life with remainder to their heirs, &c.
It is pr-oper also to say in reference to the claim made on the part of the beneficiaries, or some of them, that except as provided for in the supplemental instrument of the 17th of October, they have no right jointly or separately to elect to take the proceeds of sales under the first deed, or to direct the investment thereof otherwise than in real property in Newport, Covington, or Cincinnati. We say in real property, because this is evidently indicated by the direction to invest in productive property in one of those cities, and by the terms used in directing the manner in which the property purchased is to be conveyed and held. And again, with regard to the right of making sales. This right is plainly given by both deeds to the trustee and not to the beneficiaries. The trustee has also the right in the first instance to determine the time and manner of sale, the right being given to each beneficiary to have her portion under the first deed laid off to her, and afterwards to direct when sales thereof shall be made by the trustee, or to have it conveyed to her as directed. So far as there has been a division of lots under the first deed, this power of directing the time of sale attaches to the beneficiaries. But the right of making the sales (as well as the deeds,) remains in the trustee, and can not be exercised by the beneficiaries or others for them so *271 as to bind him without his assent or approval. And the right of directing the time of making sales seems to have been given not as a means of preventing sales altogether, but of causing them to be made at such times as the beneficiary might deem most advantageous. If a similar right may be implied under the second deed which' gives the proceeds of sales absolutely to the daughters, it is qualified 'by the necessity of supplying from sales under this deed, the funds diverted from the objects of the first, and therefore cannot be so exercised as to prevent sales by the trustee, under the second deed so far as they may be necessary for the purpose just mentioned.
A trustee appointed by the "grantor of the-benefits should not be displaced’ unless he has violated his trust, especially when asked for by part-only ol the beneficiaries. Nor should be be calB ed upon for security, unless upon a probability of loss being ' shown when no- ' security was re- ' quired by the: grantor.
The trust must subsist until all the land in the first deed is either sold or conveyed to the benficiaries, and. until an amount equal to the entire product of its sale-shall be invested, and therefore, necessarily, until that amount so far as diminished by advances madeby authority of the supplemental deed, is made up from the product of sales under the second deed. It was consequently erroneous to decree a conveyance to Mrs. Williamson and Mrs. Tibbatts, of two thirds of the land in the second deed, until it was ascertained that the sale of no part of it was necessary to make up the advanees to them respectively from the first deed, and the decree must for this cause if there were no other, be reversed.
But we think the Court erred also in directing the conveyance of two thirds of the land in the first deed to new trustees, and in removing Berry from the trust, because in our opinion no sufficient cause is shown in the record for changing the trustee selected by the grantor, and appointing others selected by two of the beneficiaries who assert an interest in the property adverse to and destructive of other interests intended to be secured by the trust. And even if it were proper to remove Berry, and invest other persons with the title hnd powers of trustees, the -respective rights of the trustees and beneficiaries, especially as to those points *272 with respect to which inconsistent claims had been asserted, should have, been defined, and although the grantor might at his pleasure entrust the management of the trust and the custody of the fund to Berry without requiring security for its safety, it should be required by the Chancellor from trustees of his own appointment. These precautions seem to have been especially necessary in appointing trustees selected by beneficiaries who while they have in fact only a partial interest in the trust, claim the whole, and seem to regard the trustee merely as their agent for the management of the property. The trustee not being their mei'e agent, but being the agent of the grantor of the property, and not only for securing and promoting their interests, but also for promoting and securing the interests of others who can not protect themselves, the.immediate beneficiaries have not the right at tbeirown mere option to change the trustee, nor is their dissatisfaction with the office, nor even with the personal conduct of the trustee, unless founded in just and sufficient causes, a proper ground on which the Chancellor should displace the trustee selected by the grantor, and particularly when he was selected not merely for the benefit of others, but in part also for his own benefit.
If, asBerry supposed, a separate estate had been secured by these deeds to thegrantor’s daughters, which it was his duty to protect, the dissatisfaction of their husbands at his efforts to protect this interest would certainly not be .aground of removal. And no more should the dissatisfaction of the daughters themselves and their husbands arising from his resistance to claims injurious to the separate and independent interests of their heirs committed to his protection, be aground for removing him from office. Although harmony and mutual confidence between the trustee and the beneficiaries are certainly desirable, they are not actually necessary for the purposes and intercourse of business. And when discordant feelings have arisen from discordant views as to the respective rights and duties of the parties, it may be expected that after a distinct definition of these rights and duties *273 by the Chancellor, the causes of discord will be removed, so far at least as may be necessary to the beneficial transaction of the business of the trust. And to that extent only is any importance to be attached to the personal relations or intercourse between the parties.
Upon the question of removal, the important enquiries are, is the trustee competent to the duties of the trust? Has he thus far discharged them faithfully and with reasonable discretion and diligence, and is there any reasonable ground to apprehend a failure thus to perform them in future? Has he wilfully and injuriously, to the beneficiaries, assumed any right or neglected any duty or otherwise abused his authority as trustee? Is there any thing in his personal character or conduct or situation, which renders him unfit to hold the office, or will prevent a beneficial exercise of its duties by him ? If all these questions are answered in favor of the trustee, there would seem to be no room left for any just cause of removal. And if some of them were even answered unfavorably so him, the enquiry would still remain as to the nature and importance of the defect, and whether removal would be the appropriate consequence. In a certain state of case, security from the trustee might be all that should be required. In another state of case a distinct annunciation of his rights and duties might suffice. The removal of a trustee who has important interests committed to his charge and especially when this is for the benefit of persons who are not before the Court and cannot speak for themselves, is a matter addressing itself to the sound discretion of the Chancellor, and on which he should exercise his own judgment, and in view of all the circumstances and of all interests involved, should act upon his own responsibility.
Whether Berry has áeted faithfully with respect to the pecuniary interests involved in the trusts, and whether there are any circumstances requiring that he should give security for the safety of the fund, or should *274 be removed for any breach of faith in regard to it, will be better ascertained upon the coming in of the report which was ordered by the decree. His poverty not having been deemed a sufficient objection to his appointment without security, should not of itself be deemed a sufficient ground either for his removal or for requiring security. His depositing the trust funds in his own name individually and not as trustee, subjects him to the hazard of loss by the failure of the bank, but does not of itself imply a breach of fidelity, nor actually increase the hazard of loss to the beneficiaries, since his own pecuniary condition, and the state of his accounts as trustee, would show that the deposite belonged to the trust and could not in equity be subjected to his individual debts. It would however, be proper to make the deposite to his credit as trustee. The only additional fact relied on as showing a misappropriation of the trust fund is, that in his accounts rendered to the the beneficiaries, or one of them, he credited himself with five per cent commission, and thus claimed to retain it. Whether this would be an unreasonable compensation, it is not necessary now to decide. His accounts shewed only that he claimed it,'the evidence' show's that he considered the amount as a matter dependent on circumstances and to be settled by a Court. The evidence also shows that in view' of the whole duties of. the trust five per cent may not be unreasonable, though in particular transactions it might be too much, or might be disallowed. We remark how'ever, that although the beneficiaries may if they choose, negocíate private sales subject to the acceptance of the trustee, and although if the terms are reasonable he should carry them into effect, they have no right by having the deeds and other writings prepared by other agents or at their own expense to withdraw from him whether to be given to another or not, the reasonable compensation intended to be secured to him for that service.— And it is'probable that with this understanding, there *275 would have been and may hereafter be no complaint of unreasonable hesitation or delay on the part of the trustee in carrying such sales into- execution, when the terms are such as he should approve.
With regard to the sale by the trustee of the four lots mentioned in the letter of Williamson and wife, of March 1849, it is not shown that they were sold without authority, or out of the usual course of the transactions up to that time. The bill admits that lots had been sold privately by the trustee with the assent of the beneficiaries, and it is not proved that there had been-any direction not. to sell. The demands of Williamson and wife in their subsequent letter and in their bills, were, as already shown, not authorized by the facts ^appearing in the record, and their rights under the deeds. The same is true of the demands made by Tibbatts and wife, in their letter of September 1849, in which they claim all the funds in the trustee’s hands, (arising from the sale of Mrs. Tibbatts’ third,) under the asserted right of declining to have them invested.
The occurrences during the pendency of the bill are doubtless attributable in some degree to the character of the charges made, and are entitled to little- effect in detei’mining the question of removal. Nor do we consider the chai-ge that the trustee holds on to the trust against the wishes of the beneficiaries, entitled to much, influence under the circumstances of this case. As to the wishes of the beneficiaries though entitled to respect, they are not to control the question. Enough however has been said upon that point. Upon the other we remark that even if a wish to earn the compensation intended for him by the- deed, be a part of the motive which induces Berry not to yield up the trust, there is no reason tosupposethat this is his only motive. On the-contrary if it had been, he probably would have been more accommodating to those who now complain of him. And selected as he was for the discharge of important duties, and the security of valuable rights he *276 might well be reluctant to yield up those rights at the wish of parties who deny them. And having been selected not only on the ground of personal confidence in him as competent and faithful for the discharge of the required duties, but also for the purpose of giving him employment and compensation, it can be no objection to him that his own interest as well as his character, and the interest of others, is involved in the question of removal.
J. T. Morehead 4* JW. Stevenson, and T. N. Lindsay for appellant; Robertson and Harlan for appellees.
If there were, or if there be, good ground for removing the trustee, we should consider the concurrence of Tibbatts and wife in the prayer for removal, and the desire of Mrs. Tibbatts as expressed on privy examination, sufficient to authorize a removal from the trust as to her, although they did not make their answer a cross bill.
We have only to add that we do not think the persons who are at pi’esent the heirs apparent of the immediate beneficiaries of this trust are necessary parties to the bill. The heirs however, who can only be known at the death of the immediate beneficiaries, are represented by the trustee.
Wherefore the decree so far as it is final, is reversed, and the cause is remanded for a decree upon the coming in of the report, not inconsistent with this opinion.