**Marguerite Hyde Suffolk and Berks, Appellee, v. Joseph Leiter et al., Appellees, on appeal of Thomas Leiter et al., Minor Defendants, Appellants.**

**Gen. No. 30,515.**

1. WILLS—*construction of formula for computing present value of trust estate as creating presently distributable income or accrued increment to book value.* Under a will creating a trust to administer certain properties owned by the testator which directed that, to ascertain the amount of the investment of the estate in such properties at any time, there should be added to the book value thereof, as shown by the testator's accounts, "interest at five (5) per cent per annum, without compounding," where the testator's son elected to take title to such properties pursuant to a further provision of such will authorizing conveyance thereof to him upon his payment to the trustees of the amount of the estate's investment therein, determined as above indicated, that part of the sum paid by him covering the 5 per cent addition to the book value became a part of the corpus of the trust estate, to be administered as provided elsewhere in the will and divided among

the designated remaindermen at the termination of the trust, and was not income thereof presently distributable among the life tenants.

2. CONVERSION—*provision authorizing conveyance of devised property to testator's son upon his performance of designated condition as effecting equitable conversion.* A provision in a will creating a trust to administer certain properties owned by the testator which directed the trustees to convey such properties to the testator's son whenever he paid to them the amount of the estate's investment therein, did not effect an equitable conversion of such properties, since it was wholly optional with such son whether to qualify to receive the conveyance.

Appeal by defendants from decree of July 10, 1925, entered by the Superior Court of Cook county; the Hon. DENIS E. SULLIVAN, Judge, presiding. Heard in the third division of this court for the first district at the October term, 1925. Reversed and remanded with directions. Opinion filed May 5, 1926.

HORACE KENT TENNEY, ROSWELL B. MASON and PATRICK J. LUCEY, guardians *ad litem,* for appellants.

SCOTT, BANCROFT, MARTIN & MacLEISH, for appellee Marguerite Hyde Suffolk and Berks; FRANK H. SCOTT and LELAND K. NEEVES, of counsel.

MAYER, MEYER, AUSTRIAN & PLATT, for appellee Joseph Leiter.

FYFFE & CLARKE, for appellee William J. Warr.

WINSTON, STRAWN & SHAW, for appellee Nancy Lathrop Carver Campbell; JOHN C. SLADE and HAROLD BEACOM, of counsel.

MR. JUSTICE TAYLOR delivered the opinion of the court.

This is an appeal by certain guardians *ad litem* appointed by the superior court for the minor defendants from a decree of the superior court of Cook county, entered on July 10, 1925, by which it was ad-

judged that the sum of $1,004,214.33—received by the trustees under the will of Levi Z. Leiter, as part of a payment of $2,038,749.01, made by Joseph Leiter for certain coal properties described in the will—was income, and immediately distributable to the life tenants, and did not belong to, and was not a part of, the principal or corpus of the trust estate.

This litigation had its inception in a bill of complaint which was filed in the superior court by Lady Suffolk on May 8, 1923, by which she sought, among other things, a construction of the last will and testament of her father, Levi Z. Leiter. Subsequently, various and voluminous pleadings were filed and ultimately, as far as this appeal is concerned, a single issue was precipitated which involved the determination, and that alone, of whether a certain fund in the hands of the trustees of the estate constituted distributable income, or corpus of the estate.

On June 9, 1904, Levi Z. Leiter, a resident of Washington, D. C., the owner of a large amount of real and personal property, died, leaving a last will and testament, which had been made and executed on June 1, 1904. The will was probated at Washington, D. C., on June 20, 1904, and in the probate court of Cook county on July 24, 1905. The estate passed through the probate courts, and the property was turned over to the trustees under the will. At the time of his death he left surviving him, his widow, Mary T. Leiter, his son, Joseph Leiter, his daughter Mary (Lady Curzon), his daughter Nancy (now Mrs. Campbell), and his daughter Marguerite (now Lady Suffolk). In 1906 Lady Curzon died, leaving her husband, Lord Curzon (who died in 1925), and her daughters, Mary Irene Curzon, Cynthia Blanche Mosley and Alexandra Naldera Curzon, surviving her. The testator's widow, Mrs. Mary T. Leiter, died in 1913. The testator's three surviving children are Joseph Leiter, Nancy (Mrs. Campbell) and Marguerite (Lady Suf-

folk). Joseph Leiter is the father of Thomas Leiter and Nancy Leiter, minors. Mrs. Campbell is the mother of Colin Campbell, Mary Neta Campbell and Audrey Nancy Campbell, minors. Lady Suffolk is the mother of Charles Henry George Howard, Earl of Suffolk and Berks, Cecil John Arthur Howard and Creville Reginald Howard, minors. Cynthia Blanche Mosley has an infant daughter.

The net residuary estate of Levi Z. Leiter, at the time of his death (excluding certain coal properties) was about $12,350,000, of which about 25 per cent was invested in personal property, and the rest in real estate. The average net income of the testator's estate—apart from the coal properties—for each of the first three years succeeding his death, was approximately $500,000.

The coal properties, which are expressly devised and bequeathed to the trustees by clause 6 of the will, consisted, at the time of the testator's death, of about 7,500 acres of coal lands, situated in the State of Illinois, and certain shares of the capital stock of the Universal Fuel Company.

The first three clauses of the will pertain to various trusts and matters which are not here directly involved.

The fourth clause devised to the testator's widow, Mary T. Leiter (now deceased) and to three of his children and to Seymour Morris, as trustees, all the residue of his estate, both real and personal, "excepting only the coal lands situated in Franklin and Williamson Counties in the State of Illinois and also certain shares of the capital stock of the Universal Fuel Co., hereinafter referred to in the sixth paragraph of this my will." Full powers were given to the trustees as to their conduct of the trust estate and its income, and they were directed to pay one-third of the income to the testator's wife during her life, and the remainder of the income—and after the death of the

Suffolk v. Leiter et al., 240 Ill. App. 457.

widow all of the income—in equal parts, to his four children, Lady Curzon, Mrs. Campbell, Lady Suffolk and Joseph Leiter. It was provided, however, that from the shares of the income given to each of the children, there was to be deducted interest on advancements, and in explanation of that provision the will recites: "It being my intention to make equal the amounts which my said children shall severally receive from my estate."

The income was to be distributed among the testator's children during their lives, and to their issue upon their death during the continuance of the trust, with no power, however, on the part of any beneficiary to incumber or anticipate the bequest. The period of the trust was to continue until the death of the last survivor of the testator's children and the final disposition of the estate. On the termination of the trust, the entire estate is to be divided among the surviving issue of the children in the proportions in which the income was directed to be distributed, in all cases *per stirpes* and not *per capita*.

In the management of the estate, the trustees were directed to keep, as nearly as may be, one-half in personal property and one-half in real estate, including therein investments upon mortgages of real property. This fourth clause of the will contains further provisions as to the powers of the trustees, and the appointment of a successor in the event of the death of Seymour Morris.

The fifth clause of the will sets forth certain advances which the testator had made in his lifetime to his children, and recites that it is his "intention to make equal the amounts which each of my said children is to receive from my estate." It directs that in the distribution of the net income, each of his children "shall be charged with interest at the rate of four (4) per cent per annum on the amount that each child has received by way of advancement    *    *    *

said interest to commence from the date that said trustees shall enter upon the discharge of their duties under the trust herein declared. The total amount of said interest charged on said advance shall be added by my said trustees to the two-thirds of the net annual income from my estate (to the whole of the net annual income after the death of my wife), and the amount thereof shall be by my said trustees divided into four equal parts or shares. One (1) share or part thereof shall be paid over by my said trustees to each of my said children * * *, that is to say, after deducting therefrom the amounts due by each of my said children as interest on the advancements made to them." That clause contains the following: "Provided, however, that until my said son shall become entitled to receive and have conveyed to him certain coal lands and other property mentioned in the Sixth Paragraph of this my said will, if the amount payable to him from his share or part of my said trust estate be in any one year less than the sum of Forty thousand dollars ($40,000), then in every such year there shall be paid by my said trustees to my said son out of the net income from the trust estate in their hands a sufficient amount to make the total sum paid to him in such year equal to the sum of Forty thousand dollars ($40,000), which amount in any such year shall be paid to him in person in equal quarterly payments upon his own receipt without any power on his part to anticipate or assign the same, and without any liability for the same to be taken from him by his creditors, it being my intention by this annuity to provide for his support and the support of his family, if he should have one. Provided, however, that until my estate shall be free from debts and encumbrances, if the amount of the share or part of my trust estate payable to my said son Joseph Leiter be in any one year less than Ten thousand dollars ($10,000), then in every such year there shall be paid by my said

trustees to my said son out of the net income from the trust estate in their hands a sufficient sum to make the total sum paid to him in such year equal to the sum of Ten thousand dollars ($10,000), payable in the same manner and for the same purposes as above provided. It is my intention that the said additional sums over and above the amount of the share or part payable to my said son Joseph Leiter from my said trust estate shall be a charge against him, and bear interest at the rate of four (4) per cent per annum.''

The Sixth Paragraph of the will, under which the fund here in controversy came into being, is as follows:

''Sixth. I have purchased and acquired the title to about Seven thousand five hundred (7,500) acres of coal lands situated in Franklin and Williamson Counties in the State of Illinois, and also certain shares of the capital stock of the Universal Fuel Company. The amount of money invested in said properties is shown on my books under the heads of 'Franklin County Lands,' 'Franklin County Land Improvement,' and 'Universal Fuel Company'; and in ascertaining the amount invested in said properties from time to time, interest at five (5) per cent per annum, without compounding, shall be added thereto. A corporation may be organized under the laws of the State of Illinois for the purpose of owning and operating said coal lands, either before or after my death, and in the event of the formation of such corporation the shares thereof shall stand in place of the said coal lands and Universal Fuel Company stock, and all the provisions herein contained shall be applicable to said shares of said corporation which may be formed.

''Said coal lands situate in Franklin and Williamson Counties, in the State of Illinois, and also the said shares of the capital stock of the Universal Fuel Company, or all the shares of said corporation which may be formed as aforesaid, I give, devise and bequeath

unto my said trustees above named in the Fourth Paragraph of this my said will, in and upon the following uses and trusts; that is, in trust to permit my said son, Joseph Leiter, to manage and control the same, and the operations thereof, and I direct that the rents, issues, profits, and dividends derived therefrom after the payment of all operating or other expenses, shall be paid over to my said trustees and shall be applied as a credit by them to the amount of money invested by me in said coal lands and stock as aforesaid, said earnings to bear interest at the rate of five (5) per cent per annum from the time the same are paid over to my said trustees.  And whenever my said son, Joseph Leiter, shall have repaid my estate in full, with interest as above stated, the whole amount invested in said coal lands and Universal Fuel Company, it is my will and I direct that my said trustees shall execute and convey to my said son, Joseph Leiter absolutely and in fee simple by proper deed, said coal lands, and shall turn over to him as his own property all of said shares of the capital stock of the Universal Fuel Company, or all the shares of said corporation which may be formed as aforesaid; and from and after the date when my said son shall receive as his own property the coal lands and stock of the Fuel Company above referred to, or all the shares of said corporation which may be formed as aforesaid, the provision contained in the Fifth Paragraph of my will in regard to his being paid a sufficient amount to make up his annual income from my estate to the sum of Forty thousand dollars ($40,000) or Ten thousand dollars ($10,000), as the case may be, shall cease and be at an end.''

For the purpose of owning and operating the coal lands referred to in clause 6, the Zeigler Coal Company, a corporation, was organized, and Joseph Leiter became its president. Apparently, the coal lands were conveyed by the trustees to that corporation in pay-

ment of its stock, and later, reconveyed by that corporation to the trustees, so that at the time of the institution of this litigation, title was in the trustees. From the testator's death, in June, 1904, to December 24, 1924, Joseph Leiter, chiefly through the corporation just mentioned managed and controlled the coal properties. Within that period, however, no payments were made by him to the trustees on account of the coal properties. Whatever income there was was used by him in operating and developing expenses, and in the purchase of other lands in the same neighborhood. Joseph Leiter claimed "that under the terms of testator's will he had the right to develop the said property along the lines planned by the testator prior to the testator's death, so far as may be necessary in view of all the circumstances to carry out the wishes and plans of testator in regard to said property, so long as the carrying out of said plans and wishes did not unreasonably jeopardize the repayment to the estate with interest of the amount advanced by the testator in connection with the said enterprise during his lifetime.''

On December 24, 1924, Joseph Leiter filed, in this cause, a petition and cross-bill. He alleged therein that he had organized the Zeigler Coal and Coke Company, with an authorized capital stock of $18,000,000, and had arranged with certain bankers to sell its bonds to the extent of $4,000,000; that the security for the bonds would be all the coal properties mentioned in clause 6 of the will, and that he was ready and willing to pay the trustees for the coal properties at the price fixed for them by the testator in clause 6 of the will. The petition asked for the court's approval of his offer. Being considered by all parties, or their representatives, as satisfactory, and after the filing of appropriate pleadings and the hearing and introduction of evidence and argument of counsel, a decree was entered on the same day sanctioning the turning over

of the coal properties, by the trustees, to Joseph Leiter, and the payment by him, to the trustees under the will of Levi Z. Leiter, deceased, of the sum of $2,038,749.01. Accordingly, he made the payment to the trustees, and his nominee received the deed to the coal properties.

According to the decree of December 24, 1924, the testator had invested in the coal properties, prior to his death, $809,066.30, and the trustees had paid out upon contracts and obligations made and entered into by the testator, during his lifetime, in connection with the coal properties, an aggregate amount of $172,-980.40. Those two amounts, with 5 per cent per annum, up to the time of the testator's death, which 5 per cent amounted to $52,487.98, make a total amount of $1,034,534.68. It was admitted that the latter amount constituted principal or corpus of the estate, but the balance of the $2,038,749.01, being $1,004,-214.33, it was claimed by Joseph Leiter and Mrs. Campbell, two of the life tenants, was immediately distributable income, while on the other hand, it was contended on behalf of all the others, Lady Suffolk and the remaindermen, or their representatives, that it was a part of the principal or corpus of the estate. According to the decree of December 24, 1924, the balance, $1,004,214.33, and which is here in dispute, was the equivalent of 5 per cent per annum on $809,-066.30, and $172,980.40 as above stated, from the testator's death to December 24, 1924.

In the decree of December 24, 1924, the court reserved jurisdiction to determine the question of income or principal, and later, on July 10, 1925, the chancellor entered a further decree by which he adjudged the $1,004,214.33 to be "presently distributable income" under the terms of the will, and not corpus of the estate, and by which he directed the trustees, accordingly, to distribute it to the life tenants. That is the decree here appealed from.

Suffolk v. Leiter et al., 240 Ill. App. 457.

The sole question in the case depends upon an interpretation of the will, and chiefly upon the intention of the testator as disclosed by clause 6.

In the recent case of *McClure v. McClure*, 319 Ill. 272, Mr. Justice Stone said:

"There are certain rules pertaining to the construction of wills which must be borne in mind not only in the construction of a will that is ambiguous, but in determining whether or not the will is so ambiguous as to require construction. The first rule in all cases is that the intention of the testator is to be determined from the entire will, and that intention is to be given effect unless it is contrary to public policy or established rules of law. The testator's intention is to be gathered not from one clause of the will, alone, but from a view of the will as a whole and all of its parts, bearing in mind the plan of the testator as expressed in the entire will."

In clause 6, the testator says: (1) "The amount of money invested in said properties (meaning his coal properties) is shown on my books," under two different titles. He then says (2) "in ascertaining the amount invested in said properties from time to time, interest at five (5) per cent per annum, without compounding, shall be added thereto." In other words, interest at 5 per cent per annum, without compounding, shall be added to the money the books show, in order, from time to time, to ascertain "the amount of money invested," or "the amount invested." After that preamble describing what amount the coal properties, from time to time, are to be figured at, the testator (3) proceeds to devise the coal properties and bequeath the shares of stock to the trustees, and, (4) to designate the use and trust for which they are to be held. That designation is as follows, "in trust to permit my son, Joseph Leiter, to manage and control the same, and the operation thereof." Following that, (5) an obligation upon Joseph Leiter, if he undertakes

the management and control, is stated in these words: "I direct that the rents, issues, profits, and dividends derived therefrom after the payment of all operating or other expenses, shall be paid over to my said trustees." There is then stated another obligation on the trustees; i. e., (6) the money paid over to them "shall be applied as a credit by them to the amount of money invested by me in said coal lands and stock as aforesaid, said earnings to bear interest at the rate of five (5) per cent per annum, from the time the same are paid over to my said trustees." Following that, there is put upon the trustees the further obligation, (7) that, whenever Joseph Leiter, "shall have repaid my estate in full, with interest as above stated, the whole amount invested in said coal lands and Universal Fuel Company, * * * my said trustees shall execute and convey to my said son Joseph Leiter," in fee simple, by proper deed, the coal lands, and turn over to him all the shares of the Universal Fuel Company.

Taking then what might be called the seven general ideas so expressed in clause 6, and putting them in, perhaps, more logical order than they appear in the text, we have the following:

1. The testator devised and bequeathed his coal properties to the trustees;

2. The trustees were to hold them in trust and permit Joseph Leiter to manage, control and operate them;

3. If Joseph Leiter undertook to manage and control them, he was to pay over the net rents, issues, profits and dividends to the trustees;

4. The money so paid over to the trustees should be applied by them as a credit on the amount of money invested by the testator in the coal properties, and bear interest at the rate of 5 per cent per annum from the time they are paid over to the trustees;

5. Whenever Joseph Leiter should have repaid the estate in full "with interest as above stated, the whole

amount invested" in the coal properties, the trustees should execute and convey to him the properties in question;

6. The amount of money invested in said properties was shown on the testator's books; and

7. "in ascertaining the amount invested in said properties from time to time, interest at 5% per annum, without compounding, shall be added thereto."

As Joseph Leiter, from the testator's death in June, 1904, to December 24, 1924, chiefly through the Zeigler Coal Company, undertook to manage and control the coal properties, but did not meanwhile pay over to the trustees any "net rents, issues, profits and dividends," and as on the other hand, as set forth in the decree of December 24, 1924, he did pay over on that date to the trustees under the will, the aggregate sum of $2,038,749.01—part of which, $1,034,534.68, was admitted by all, to belong to the corpus of the estate—the chief question is, in order to determine the quality of the balance of the fund, what did the testator intend when using the words "the amount of money invested in said properties is shown on my books   *   *   *, and in ascertaining the amount invested in said properties from time to time, interest at five (5) per cent per annum, without compounding, shall be added thereto."

The ultimate source of the contest lies in the use of the word "interest" in fixing the formula or standard by which the amount ultimately to be paid must be ascertained.   Does the $2,038,749.01 contain any element of interest *qua* interest, and, therefore, distributable income?   Of course, that sum is in and of itself the ascertained "amount" that the sixth clause expressly and definitely specifies—after making a simple computation from definite facts, by using the rule prescribed by the testator—that Joseph Leiter was bound to pay *en bloc* to the trustees at the time he requested and received title to the coal properties.

What Joseph Leiter then was bound to pay *en bloc* to the trustees in order to get title to the coal properties was the ascertained "amount" that clause 6 expressly and definitely specified should be determined by making a simple computation pursuant to the rule prescribed. No one denies that clause 6 fixed the formula, and no one denies that it was properly applied, and that the ascertained "amount," $2,038,749.01 was correct. But because in stating the terms of the formula, in prescribing the measure of the total or final amount, the word "interest" was used, it is claimed that, although, seemingly, at first blush, intended only to show how the total or final amount should be ascertained, nevertheless, by the words he used, he also intended that the 5 per cent per annum should be considered as income, and not corpus. Of course, the conditional gift created by clause 6 did not create, on the death of the testator, a debt on the part of Joseph Leiter to the trustees of the estate. The property involved was held by the trustees as part of the principal or corpus of the estate, and there was no obligation on Joseph Leiter, then or thereafter, to pay any interest of any kind on any indebtedness, and when, 20 years after the death of the testator, Joseph Leiter for the first time undertook to pay the ascertained amount and accept the gift, and receive title, he paid no interest *qua* interest, and was not required to pay any, as there was no sum on which interest had been running. He was merely to pay a lump sum ascertained in a certain way, and when the total amount was figured out according to the rule prescribed by the testator and paid over to the trustees, it merely took the place, as an amount *en bloc,* of the coal properties themselves, which up to that time had remained part of the corpus of the estate.

The coal properties at the time of the testator's death belonged to his estate, and title to them passed to his trustees. That gave the trustees not only title

to the coal properties, but also the right to any income which might be derived from their use, and from that, it follows that if Joseph Leiter had died or renounced the gift, and the trustees subsequently sold the coal properties, whatever they received for them would take the place of the coal properties themselves and be of the same nature or quality; that is, part of the principal or corpus of the estate, and thereafter, if what the trustees received was invested and produced income, that would be distributable under the will. The will, however, required the trustees to hold the coal properties, subject to an election by Joseph Leiter to manage and control them, and to his right to take them over at what may be properly called a fixed amount. As it turned out, Joseph Leiter availed himself of his privilege, not only of operating the mines, but of paying over the amount which the will provided as a prerequisite to his obtaining title. He got the properties for the amount which the testator had fixed, and which was determined by what the books showed, with 5 per cent thereof added to make the total.

Clause 6 provided, in our judgment, that Joseph Leiter could obtain title to the properties in question from the trustees whenever in his lifetime he paid what it cost the testator, with 5 per cent in addition. The will provided, as we have said, a fixed standard by which the amount to be paid was to be ascertained or measured. It designated a particular mathematical computation. It prescribed that "in ascertaining the amount invested in said properties from time to time, interest at 5% per annum, without compounding, shall be added thereto." Of course, the words "interest at 5% per annum" are a symbol merely of number and not of quality. The use of the word "interest," in a sense, is an obvious misnomer, but was used with the others apparently for convenience, as an arbitrary standard of measurement, and to avoid circumlocu-

tion. Of course, as we have said, there was nothing due from Joseph Leiter to the trustees until he saw fit to comply with clause 6, and so there was nothing upon which interest could run, and the word was out of place. There is no such thing as interest, compensation allowed by law or contract for the use, forbearance or detention of money where there is no use, forbearance or detention, and here there was none, because there was no legal obligation whatever of any kind upon him. Interest *qua* interest is merely an incident to a debt to be paid from time to time, but here, as there was no debtor, there could be no such interest. "Interest is compensation for the use of money which is due." *Cochran v. Boston*, 211 Mass. 171.

The will also provided that the net earnings from the coal properties to be paid by Joseph Leiter to the trustees, if any, are "to bear interest at the rate of five per cent per annum." The word "interest" so used does not mean interest *qua* interest. It was used, with its context, as a standard of measurement, in making out a credit account.

The word "interest" in the expression, "with interest as above stated," in the latter part of clause 6, has direct reference to the use of that word in the earlier expression, "in ascertaining the amount invested in said properties from time to time, interest at five (5) per cent per annum, without compounding, shall be added thereto"; in other words, it is used with the others, in a similar way, and the whole expression is merely a symbol of number and not a symbol of number and quality combined.

The word "interest" is a word of great flexibility, and, depending upon the context, may connote any one of many meanings. Certainly here, where a principal amount, a totality, a final sum, the amount of a commercial investment is to be ascertained in order that the prospective payor may know just what amount he is to pay over, and the words given us are "interest

at five per cent per annum, without compounding, shall be added thereto," they are intended merely as a prescribed mathematical formula to be used in reaching a single ultimate amount. It is exactly the same, we think, as if the will had said, "the equivalent of interest at five per cent per annum, without compounding shall be added thereto." The words of the will, "shall be added," import that, after the addition, there is then, and then only, an ascertainment of the amount invested, and, when that is done, the formula, and all the words that make it, has served its intended purpose, and its only purpose, and it is, in meaning and application, exhausted. To pick out a single word from the formula and make from it an intended cleavage between income and principal—a subject wholly foreign to the purpose of the particular text—seems to require repudiation of obvious meaning and the interjection of a merely conjectural possibility.

In clause 5 of the will, there is a formula for determining the annual net income to be paid to each child. It may be illustrated as follows: (The amounts of gross income and interest on advancements are here hypothetical.) Assuming the total income for the first year to be $600,000, of which the widow would receive $200,000, the balance is to be divided by four, the number of children, making a gross income for each, of $100,000. But to ascertain the total net income to be divided between the four children, the formula prescribed that there is to be added to their total gross income of $400,000, an amount equal to 4 per cent interest on the respective advances made to each child. The words of the will are, "which said interest on said advances shall be treated by my said trustees as so much additional income received by them, and the amount thereof shall be by my said trustees divided into four (4) equal parts or shares." It also provides that each child shall receive one of such parts, "after deducting therefrom the amount

due by her as interest at the rate of four (4) per cent per annum on the advancements'' made to him or her.

Taking, then, $400,000 as the gross annual income, and $1,000 as representing 4 per cent interest on the amount of the advancement of each of the three daughters, and $4,000 as representing 4 per cent interest on the advancement to the son, the total amount of ''interest on said advances,'' ''which is to be treated as so much additional income received by the estate,'' would be $7,000, and the amount to be divided into four parts would be $400,000 plus $7,000, or $407,000. Dividing that by four, the number of children, and the result is $101,750. The formula then prescribes that each child shall receive that amount after deducting therefrom interest on his or her advancement. Deducting $1,000, the amount of such interest, from $101,-750, leaves $100,750, the net annual income of each of the three daughters. And deducting $4,000, the amount of the interest on the son's advancement, from $101,750, there is left $97,750, the net income of the son. Of course, three times $100,750, plus $97,750, make $400,000, the gross income we started with. This may seem prolix, but we think it is significant. It is evidence of the use of term ''interest'' in another formula in the same will and prescribed for a similar purpose, the ascertainment of a particular amount, just as the phraseology of clause 6 uses the same term in creating a prescribed formula in order merely to ascertain—and exists and is stated for no other mentioned purpose—a particular total amount.

Clause 5 provides a formula for ascertaining the amount of annual income for each, and clause 6 provides a formula for ''ascertaining the amount invested,'' from time to time in the coal properties. It is true that clause 4 says, ''an amount equal to four (4) per cent interest,'' and in clause 6 it says, ''in ascertaining the amount invested in said properties from time to time, interest at five (5) per cent per

annum, without compounding, shall be added.'' In substance, however, considering the whole of clause 6, its purpose and that of the whole will, there is evidenced on the subject of determining an ''amount,'' no qualitative difference of intention from that expressed in clause 5. There was provided in each case a formula for the determination of a particular ''amount,'' and the formula in each case was for that purpose only. To attribute the meaning to the word ''interest,'' which is claimed for it by the life tenants, seemingly, would be magnifying a trifle into an expression of intention on a subject that was not mentioned nor even suggested.

It is urged that the provisions of the sixth clause were for the benefit of Joseph Leiter, and were not intended for the benefit of the remaindermen. The answer to that is, the words must be taken as written and in their normal sense, and if, interpreted in that way, they show, as we think they do, what we have already explained and stated then it is not the right of a court to distort them in order to benefit the life tenants. The ideal, or what might be expected, does not control. The words of the will are paramount.

It is true that if Joseph Leiter, one year or five after the testator died, had paid to the trustees the then amount ascertained as prescribed, the life tenants would have been, immediately, entitled to receive all income thereafter derived by the trustees on the particular sum paid by Joseph Leiter for the properties in question. But the money was not paid until the expiration of 20 years, and, in our judgment, the will did not make any part of it income, or a source of income, until it was paid.

It is further urged that the only persons injured through a delay in the payment to the trust estate of the amount provided for in clause 6 were the life tenants, and that it could not make any difference to the remaindermen whether Joseph Leiter paid the neces-

sary amount to the estate the day after the testator's death, or 20 or 30 years thereafter. But putting the construction we do upon the will, it was evidently the intention of the testator that that part of the corpus of the estate represented by the coal properties, if taken over by Joseph Leiter, should increase in value from year to year, at the rate of 5 per cent of the book investment, and there is nothing unreasonable in that, as it is common knowledge in the commercial world that in figuring on an investment, a careful, businesslike owner generally considers it as costing him the cash investment, together with the equivalent of conventional interest added from year to year.

It is urged that there was an equitable conversion of the coal properties. In *Howard v. Peavey,* 128 Ill. 430, the court said:

"The test is, has the will or deed absolutely directed that the conversion be made? In order to work a conversion while the property remains unchanged in form, there must be a clear and imperative direction to convert it. If the act of converting is left to the option, discretion or choice of the trustees or others charged with making it, no equitable conversion will take place, because no duty to make the change rests upon them." Citing 3 Pomeroy's Eq. Jur. sec. 1159 *et seq.* and authorities cited.

Title to the coal lands was to remain in the trustees until Joseph Leiter fulfilled—and there was at no time any binding obligation on him—the requirements of clause 6, and, so we are not justified in considering the will as producing an equitable conversion. We are not entitled to consider that done which, admittedly, might never be done. It is argued that the testator intended that the coal properties should be converted into income producing property. The will does not provide that they shall, but only that, dependent entirely upon the voluntary conduct of Joseph Leiter, they may.

In *Gibson v. Bott*, 7 Ves. Jr. 89, on which certain appellees rely, the testator left certain property to his executors "upon trust that they shall and do, as soon as conveniently may be after his decease, make sale and absolutely dispose of and convert into ready money all such parts thereof as shall not consist of money," and Lord Eldon applied the principle "that what is directed to be done shall be considered as done." In that case, a sale by the executors as trustees was mandatory, while in the instant case, the trustees were entirely subservient to the will of Joseph Leiter and if he died without accepting the gift, there was no obligation on the trustees to transmute the coal properties into money. Likewise in *Taylor v. Clark*, 1 Hare 161, the directions to the executors, as trustees, were mandatory, and they had complete authority to make a sale or bring about a conversion. Also, in *Lawrence v. Littlefield*, 215 N. Y. 561, "the power of sale contained in the will was an imperative one to sell all the real property," with certain exceptions, and the court held "that there was an equitable conversion of all her real property, excepting that so specifically devised as of the time of her death."

In each of the foregoing cases, the trustees were bound to sell, and, also, in and of themselves, without dependence on any one else, had full power to do so. In the instant case, the transmutation of that part of the corpus of the estate made up of the coal properties into money, was dependent entirely on the action of Joseph Leiter, and whether or not in his lifetime that transmutation would take place, depended upon him, and in no way upon the trustees. As far as the judgment or conduct of the trustees was concerned, the coal properties remained part of the principal, and they, in and by themselves, of their own volition, were powerless to make any change.

In clause 4, the will says: "The entire principal, however, of the estate held under trust in this para-

graph of my will created, shall continue to be held by the said trustees until the death of the last surviving of my said children.'' But, from the devise and bequest of ''The entire principal'' it is expressly provided in clause 4, that the coal properties are excepted. The learned chancellor, according to a statement made by him—which is set forth in the brief of counsel for Joseph Leiter, but which is not disclosed in the record—deduced from the devise and bequest, in clause 4 just referred to, that as they made no reference to any additions to the estate, the result was ''the will was one—if it may be so denominated—of distribution, and not of accumulation.'' As, however, the coal properties were expressly excepted from the devise of the principal estate made by clause 4, and they were expressly devised and bequeathed to the trustees only by clause 6, the latter alone controls and determines whether, as to those properties, there was to be accumulation or distribution. We are practically told by the testator, as to the coal properties, not to consider clause 4, but to consider only clause 6. There is, therefore, nothing in the will on this subject, save in clause 6, that helps us. Clause 6 is almost like a will within a will. It involves an excepted set of property rights, which are in terms segregated from the ''entire principal'' of the estate. Considering what it covers and accomplishes, it is brevity itself. It only extends to one page of typewriting, double space. And yet it involves the transfer of property interests valued at millions. Small wonder, then, to avoid periphrasis, he used the expression here in controversy. And, certainly, if he had intended to interject a brand new subject—the segregation of the amount of 5 per cent of the amount shown on the books, and the designation that it should be distributable income, and only the amount shown on the books, corpus—he would have incorporated or mentioned it, at least, as a subject-

matter. In our judgment, clause 6, and the whole will, is silent on that matter.

It is argued for the life tenants that in the absence of any direction in the will to the contrary, it is to be presumed that the testator intended the remaindermen to receive, so far as possible, the same estate left by the testator; i. e., neither increased nor diminished except by change in the value of the specific property devised. In our judgment the will does contain, in clause 6, such express directions and provisions to the contrary so that there is no need to indulge in any presumption in order to discover the intention of the testator, and, as the result of a normal interpretation of the words of that clause, the will does provide for a regular annual increase in the estate left to the remaindermen in case Joseph Leiter take it over by paying the prescribed amount. It may be if Joseph Leiter had turned over the rents and profits to the trustees that then the amount he was required to pay to get title would have been paid over long ago, and, as corpus of the estate, would have been producing distributable income. It may be that the life tenants have suffered a deprivation as the result of the course he has pursued. That, however, is immaterial, and it is not an issue here.

In conclusion, after careful consideration of the matter, we think the will shows it was the intention of the testator—if his son at any time undertook to accept the gift or proffer made by clause 6, by paying a sum in money—that the amount to be paid should be ascertained by taking what the books showed and adding 5 per cent thereto, and that it was his intention that the total amount so ascertained should take the place of the coal properties and become, *in toto,* a part of the principal or corpus of the estate in the hands of the trustees.

In our opinion the $1,004,214.33, which was paid to the trustees, belongs to the principal or corpus of the

estate of Levi Z. Leiter, deceased. The decree of the chancellor, entered on July 10, 1925, is reversed, and the cause remanded with directions to enter a decree in accordance with this opinion.

*Reversed and remanded with directions.*

THOMSON, P. J., and O'CONNOR, J., concur.