Marguerite Hyde Suffolk and Berks, Individually and as Trustee Under the Last Will and Testament of Levi Z. Leiter, Deceased, Appellant, v. Joseph Leiter, Individually and as Trustee Under the Last Will and Testament of Levi Z. Leiter, Deceased, et al., Appellees.

Marguerite Hyde Suffolk and Berks, Individually and as Trustee Under the Last Will and Testament of Levi Z. Leiter, Deceased, v. Joseph Leiter, Individually and as Trustee Under the Last Will and Testament of Levi Z. Leiter, Deceased, et al.

Mary Irene Curzon, Cynthia Blanche Mosley and Alexandra Naldera Metcalfe, Appellants.

Gen. Nos. 32,621–32,622.

84

Opinion filed March 24, 1931.

SCOTT, BANCROFT, MARTIN & MACLEISH, for appellant Marguerite Hyde Suffolk and Berks; FRANK H. SCOTT, LELAND K. NEEVES and CHARLES CRANSTON SPRAY, of counsel.

COOKE, SULLIVAN & RICKS, for appellants Mary Irene Curzon et al; GEORGE A. COOKE, HOMER D. DINES and EDWARD H. FIEDLER, of counsel.

MAYER, MEYER, AUSTRIAN & PLATT, for appellee Joseph Leiter.

WINSTON, STRAWN & SHAW, for appellee Nancy Lathrop Carver Campbell.

ROSWELL B. MASON, guardian *ad litem* for appellees Thomas Leiter et al.; ROSWELL B. MASON, RUSSELL WHITMAN and HENRY G. MILLER, of counsel.

HORACE KENT TENNEY, guardian *ad litem* for appellees Charles Henry George Howard et al. PATRICK J.

Lucey, guardian *ad litem* for appellee Vivian Elizabeth Mosley; Horace Kent Tenney, Patrick J. Lucey and S. Ashley Guthrie, of counsel.

Mr. Justice Kerner delivered the opinion of the court.

On May 4, 1923, Marguerite Hyde Suffolk and Berks, individually and as trustee under the last will and testament of Levi Z. Leiter, deceased, filed her bill against her brother, Joseph Leiter, her cotrustee; four days later, Mary Irene Curzon, Cynthia Blanche Mosley and Alexandra Naldera Metcalfe, children of Mary Victoria Curzon, deceased, who was also a daughter of Levi Z. Leiter, deceased, filed their cross-bill; both complainant and cross complainants sought to effect the removal of Joseph Leiter as one of the trustees under the will of Levi Z. Leiter, and to compel him to account to the estate. Guardians *ad litem* were appointed for the various infant parties, issues joined and trial had. The chancellor heard the evidence, comprising 16,500 pages of testimony, and a great many transactions covering a period of more than 20 years, and after amended and supplemental pleadings, on January 14, 1928, entered a decree denying the prayer for the removal of Leiter as trustee; declared the appointment of William J. Warr, as trustee, invalid; appointed Daniel V. Harkin, trustee, and referred the cause to a master in chancery to state an account between the trustees and the estate. From this decree, only so far as it denied the prayer for the removal of Leiter as trustee, the complainant and cross complainants separately appealed, which appeals have been consolidated here.

On June 9, 1904, Levi Z. Leiter, a resident of Washington, D. C., died, leaving a last will and testament, which had been made and executed on June 1, 1904. The will was probated at Washington, D. C., on June 20, 1904, and in the probate court of Cook county, Illinois, on July 24, 1905. The estate passed through

the probate courts, and the property was turned over to the trustees under the will. At the time of his death the testator left him surviving his widow Mary T. Leiter, his daughter Mary (Lady Curzon), his daughter Nancy (now Mrs. Campbell), and his daughter Marguerite (now Lady Suffolk). In 1906 Lady Curzon died leaving her husband Lord Curzon (who died in 1925), and her daughters Mary Irene Curzon, Cynthia Blanche Mosley and Alexandra Naldera Curzon surviving her. Mary T. Leiter died in 1913; Mrs. Campbell died on June 22, 1930, leaving her surviving Colin Campbell, Mary Neta Campbell and Audrey Nancy Campbell, minors. Joseph Leiter is the father of Thomas Leiter and Nancy Leiter, minors. Lady Suffolk is the mother of Charles Henry George Howard, Earl of Suffolk and Berks, Cecil John Arthur Howard and Greville Reginald Howard, minors, who have since the entry of the decree arrived at legal age.

The net residuary estate of the testator (excluding certain coal properties) was about $12,350,000, of which about 25 per cent was invested in personal property and the rest in real estate.

The first three clauses of the will pertain to various trusts and matters which are not here directly involved.

The fourth clause devises to the testator's wife (now deceased), to three of his children, and to Seymour Morris as trustees, all the residue of his estate, both real and personal, ''excepting only the coal mines situated in Franklin and Williamson Counties in the State of Illinois, and also certain shares of the capital stock of the Universal Fuel Company, hereinafter referred to in the Sixth Paragraph of this my will,'' and so far as it has any bearing on the case, is as follows:

''To Have and to Hold all and singular the real estate, with the appurtenances thereunto belonging or appertaining, and the personal property, upon the

trusts and for the uses and purposes hereinafter declared; and in order to carry into effect the trust hereby reposed in my said trustees, I do hereby give and invest them and their successors and the survivors or survivor of them with such authority and powers over the property hereby devised and bequeathed to them and such estate therein as may be necessary to enable them to effectually execute my intentions in respect thereto. . . .

"It is my will that such trustees shall collect and receive and that they may give acquittance for all the rents, issues and profits, interest and dividends of the said trust estate, and that they shall pay therefrom all the expenses of management thereof, including taxes, and assessments of every sort, insurance and repairs. . . .

"And said trustees are given full power and authority to lease any of the real estate or to sell and convey any of the real or personal estate held by them as trustees as aforesaid, and also to borrow money and to secure the repayment thereof by mortgage or trust deed on any of the real estate held by them, for either of the following purposes, to wit: for the purpose of paying any encumbrance which may be upon any of the property held in trust under my will, or to make improvements upon any of the property so held in trust by them. . . .

"I also authorize and empower my said trustees and their successors to use and apply such portions of the net income derived from said trust estate, as they may deem best, either in the payment of mortgages or encumbrances upon the same, or any part thereof, or in making improvements upon any of the property so held in trust by them under my will.

"It is my will and I direct that in the management and conduct of my estate the said trustees shall keep

and hold one-half (½) part thereof, as nearly as may be, in purely personal property and one-half (½) part thereof, as nearly as may be, in real estate, including therein investments upon mortgage of real property; and they shall have power to make and change from time to time investments of said trust property; and they shall have power to lease, also to make ground leases, for such term or terms as they may approve; and to erect buildings upon my property and to repair and rebuild whenever that may be necessary, and to invest and reinvest trust moneys coming to their hands, but having regard in all investments, however, to the security of the fund rather than the rate of revenue to be derived therefrom; and generally, it is my will and I direct that all of my said trust estate, real and personal, shall, subject to the foregoing provisions, be at all times subject to the absolute control and management of my said trustees, to be sold, conveyed, leased, or otherwise disposed of by them for the purposes of said trust, as I myself have the right and power to do at the time of making this my will. In exercising the powers herein conferred upon my said trustees, I direct that the majority of the trustees acting from time to time under this my last will, may exercise any of the powers conferred by my said will upon said trustees; and any act done or instrument executed by a majority of said trustees either in person or by an attorney in fact, shall be as valid and effectual as though done by all of said trustees, provided, however, that during the life of my wife, Mary T. Leiter, no conveyance or mortgage of real estate or lease of real estate for a term of longer than ten years shall be made by my said trustees without her joining in the execution thereof.

''I desire that the number of trustees for the execution of the trust provided herein shall not be less than three (3); and whenever the number of said trustees shall be reduced to two (2), by death, resignation, un-

willingness to serve, or other disqualification, it shall be lawful for the remaining trustees or trustee for the time being to substitute by an instrument in writing any person or persons in whom jointly, with any surviving and continuing trustees or trustee, my trust estate shall vest or by proper assurances be vested, and in case any trustee so appointed shall not be a beneficiary, sharing in the distribution under the trust hereby created, the trustees making such appointment may direct a reasonable compensation to be paid to any such new trustee for services rendered in such trust, and a corporation lawfully authorized to execute such trust may be one of said trustees.

. . . . . .

"In the event that the said Seymour Morris shall cease to be a trustee under my will, then it is my will and I direct that within ninety (90) days after such vacancy shall occur, the vacancy in the trusteeship so occurring shall be filled by an appointment made by the remaining trustees or trustee under my will by an instrument in writing appointing a successor in trust, in whom, jointly with the surviving and continuing trustees or trustee the trust estate shall vest or by proper assurances be vested. . . . Provided, however, that the first successor in trust to the said Seymour Morris shall be Chauncey Keep of the City of Chicago, if he shall be living and willing and able to accept said trust.

. . . . . .

"In the event that the remaining or surviving trustees shall not fill any vacancy which it shall be necessary to fill, in order to comply with the directions of my said will, within ninety (90) days after such vacancy shall occur, it shall be lawful for any Court of Chancery having jurisdiction in the County of Cook and State of Illinois, to fill such vacancy upon the application of any person interested in the trust fund affected by such vacancy; notice in writing of such ap-

plication having been previously given to the remaining or surviving trustees or trustee.

"Any trustee under this my said will may act in the execution of leases, deeds and all other instruments by an attorney in fact duly authorized by an instrument under seal, executed and acknowledged in accordance with the laws of the State of Illinois, covering the execution and acknowledgment of deeds for the conveyance of real estate, and any act done or executed by such attorney in fact shall be as legal and valid in all respects as though done or executed by said trustee in person."

The sixth clause is as follows:

"*Sixth.* I have purchased and acquired the title to about Seven thousand five hundred (7,500) acres of coal lands situated in Franklin and Williamson Counties in the State of Illinois, and also certain shares of the capital stock of the Universal Fuel Company. The amount of money invested in said properties is shown on my books under the heads of 'Franklin County Lands,' 'Franklin County Land Improvement,' and 'Universal Fuel Company'; and in ascertaining the amount invested in said properties from time to time, interest at five (5) per cent per annum, without compounding, shall be added thereto. A corporation may be organized under the laws of the State of Illinois for the purpose of owning and operating said coal lands, either before or after my death, and in the event of the formation of such corporation the shares thereof shall stand in place of the said coal lands and Universal Fuel Company stock, and all the provisions herein contained shall be applicable to said shares of said corporation which may be formed.

"Said coal lands situate in Franklin and Williamson Counties, in the State of Illinois, and also the said shares of the capital stock of the Universal Fuel Company, or all the shares of said corporation which may be formed as aforesaid, I give, devise and bequeath

unto my said trustees above named in the Fourth Paragraph of this my said will, in and upon the following uses and trusts; that is, in trust to permit my said son, Joseph Leiter, to manage and control the same, and the operations thereof, and I direct that the rents, issues, profits, and dividends derived therefrom after the payment of all operating or other expenses, shall be paid over to my said trustees and shall be applied as a credit by them to the amount of money invested by me in said coal lands and stock as aforesaid, said earnings to bear interest at the rate of five (5) per cent per annum from the time the same are paid over to my said trustees. And whenever my said son, Joseph Leiter, shall have repaid my estate in full, with interest as above stated, the whole amount invested in said coal lands and Universal Fuel Company, it is my will and I direct that my said trustees shall execute and convey to my said son, Joseph Leiter absolutely and in fee simple by proper deed, said coal lands, and shall turn over to him as his own property all of said shares of the capital stock of the Universal Fuel Company, or all the shares of said corporation which may be formed as aforesaid; and from and after the date when my said son shall receive as his own property the coal lands and stock of the Fuel Company above referred to, or all the shares of said corporation which may be formed as aforesaid, the provision contained in the Fifth Paragraph of my will in regard to his being paid a sufficient amount to make up his annual income from my estate to the sum of Forty thousand dollars ($40,000) or Ten thousand dollars ($10,000), as the case may be, shall cease and be at an end.''

Mary T. Leiter died March 6, 1913. No successor trustee was ever appointed to fill the vacancy resulting from her death, there being no necessity therefor under the will. After her death the trustees were Leiter, Mrs. Campbell, Lady Suffolk and Morris. Morris died about September 27, 1921, and Leiter, Mrs. Campbell

and Lady Suffolk continued to act as trustees. Chauncey Keep, named by the testator in his will as the first successor in trust to Morris, declined to act, and thereupon the question arose between the surviving trustees as to filling the vacancy, and as to who should be appointed to fill the same.

At a meeting of the trustees on November 30, 1921, Leiter and Mrs. Campbell announced their determination to appoint Warr as trustee. Subsequently a formal document was executed by them only purporting to appoint Warr as successor to Morris.

The trust created under paragraph sixth terminated on the transfer of the coal property to Leiter's nominee, pursuant to a decree of the superior court of Cook county, Illinois, of December 24, 1924, and all of the moneys received by the trustees in that connection are now held as part of the corpus of the trust estate under paragraph four, including the so-called interest which was the subject matter of the decision of this court in *Suffolk v. Leiter*, 240 Ill. App. 457. The trust so created under paragraph four continues until the death of the last survivor of the testator's children, so that the death of the last survivor of Lady Suffolk and Leiter will terminate the trust. Upon such termination, the corpus will go to the various descendants of the four children of the testator.

By the decree of January 14, 1928, the chancellor substantially found *inter alia* that Levi Z. Leiter had been a successful merchant, real estate investor, miner, cattle raiser and a promoter of various enterprises requiring the investing of capital and keen judgment; he accumulated and left an estate in real and personalty of many millions of dollars, most of which was income producing; that while making provisions that his wife should receive one-third of the income of the estate during her life, he provided, in substance, by his will that his four children, subject to the foregoing provisions for his wife, should receive the income from

the estate, but that the corpus or body of the estate should be left to his grandchildren then in being or thereafter born; that as executors of this vast estate, he selected his son and his wife, and then provided that upon the closing of the estate it should go to the trustees for control and management, and provided that the trustees should consist of his wife, Marguerite Hyde Leiter and Nancy Leiter, his daughters, his son, and Morris, all of them being beneficiaries and interested in the income of the estate, except Morris; that the trust was an active, live trust consisting of various business enterprises in process of operation; in Wyoming it consisted of the possession and operation of many acres of land upon which cattle were being grazed and prepared for the market; in Illinois, outside of Chicago, of many thousands of acres of productive coal lands which were in process of development and operation; in Chicago, of experimental coke plants where coal from the contemplated mines was being reduced to commercial coke, and also of many office and store buildings which were leased for the conduct of various businesses; that of the original testamentary trustees, death has removed the widow and Morris, leaving the three children as trustees, supplemented by Warr, who was appointed by Leiter and Mrs. Campbell to replace Morris, and whose appointment is challenged in this suit; that Leiter, a middle-aged man of 58 years, was evidently intended by his father to follow in his footsteps; that during his boyhood his father had him employed in various capacities, and after his graduation from Harvard, employed him to assist in all the various enterprises in which the testator was then engaged; that during the succeeding years until the death of his father in 1904, Leiter succeeded his father in the active management of these various properties, and employed himself in various capacities, putting himself to do what apparently was required or that his father suggested; that

during this time the family was apparently bound together by strong ties of affection, both the parents and sisters by common consent accepting Leiter as the natural successor and managing director of these vast properties; that after the testator's death, although the will—aside from the exception regarding the Ziegler coal properties—made no distinction as to the powers and duties of the various trustees, by common consent Leiter was accepted as the managing head of the trustees; that this became necessary for the reason that after Mrs. Leiter's death, Leiter was the only member of the family who was a resident of this country, and he and Morris managed the properties and made reports to their cotrustees; that the sequence of events naturally caused him to be the logical one for this position, as his two sisters, Mrs. Campbell and Lady Suffolk, residents of England—and especially Lady Suffolk, who at one time was absent in India for a period of five years—were prevented from giving any personal attention to the estate, and the burden fell upon Leiter and Morris.

That the will provided that the trustees might act as to some particular duties through properly executed powers of attorney; that Lady Suffolk nominated an eminent lawyer, the late John P. Wilson, as her representative on the board of trustees, and upon his death, nominated William Scott Bond as her representative; that Mrs. Campbell nominated her brother as her representative; that at the time of the death of the testator he was maintaining an office in one of his properties in Chicago for the management of his properties; the trustees continued the office, where bookkeepers, clerks, auditors, and other employees were carrying out the manifold duties devolving upon them in the management of this property and in carrying out the terms of the will; that Mr. Henry Russell Platt, who had been the attorney and counselor of the testator, was continued in a like capacity for the trustees

and advised them on the legal questions involved, as well as aiding them in the solution of many of the practical questions in the management of the estate; that Warr had been an employee of the testator and was in charge of the office, performing various duties of an executive and discretionary nature which were entrusted to him; that it is conceded that he was honest, industrious, and faithful whilst performing such duties; that Morris was a prominent real estate operator, having vast experience with estates, and up to the time of his death actively performing his duties as trustee; that no one questions his honesty and loyalty to the properties that he was appointed to protect; that Lady Suffolk resides in England with her family; she made several visits to America during her trusteeship, but her stays were short and her examinations of the various properties necessarily very cursory, and the intricacies of the work were of such a nature that, without constant attention here, she must always remain unfamiliar with the numerous details of the variety of transactions; that during the period of five years that she was in India she was almost isolated from any connection with the operation of the properties; that Mrs. Campbell was also a resident of England until 1919, when she became a resident of the State of California; that she also exercised a supervision over the estate and maintained some more familiarity with it than Lady Suffolk, especially since she became a resident of California.

That in clause six of the will the testator stated that he had acquired the title to about 7,500 acres of coal lands in Franklin and Williamson counties, Illinois, and certain shares of the capital stock of the Universal Fuel Company; that the amount of money invested in said properties was shown on his books under the headings of "Franklin County Lands," "Franklin County Land Improvement," and "Universal Fuel Company"; that he provided that a corporation might

be organized under the laws of Illinois for the purpose of owning and operating said coal lands, and in the event of the formation of such corporation, the shares thereof should stand in the place of the said coal lands and Universal Fuel Company stock, and all the provisions in the will should be applicable to said shares of said corporation; that these coal lands and the shares of the Universal Fuel Company, and all the shares of the corporation which might be formed as aforesaid, were given to the trustees in trust to hold them and permit his son to manage and control the lands and mines, and the operations thereof,—the rents, issues, profits, and dividends derived therefrom, after the payment of all operating or other expenses, to be paid to the trustees, to be applied as a credit to the amount of money invested in the coal lands and stock; that the will provided what should be done with the dividends, increases, and profits, but it made no provision as to what should be done with the losses, or how the necessary capital should be provided for operating the mine which was already in existence and operation at the time of the testator's death, the capital being supplied from the funds of the testator; that it is a fair intendment that the mine should continue operations, and the capital be supplied by the funds of the estate.

That the provisions of clause six of the will intended Leiter should have the sole control of the management and operation of the mines through the medium of the corporation which the will provided should be formed; that the formation of a corporation under the laws of Delaware instead of Illinois (as provided in the will), for the claimed reason that divergence of citizenship was desirable as creating a cause for federal court jurisdiction, is a matter of practical administration of the estate, but, as no damage to the estate has resulted, it will not be regarded as consequential; that when the testator used the expressions "Franklin County

Lands," "Franklin County Land Improvement," and "Universal Fuel Company," he spoke of the mining enterprises as an entire entity, and had in mind the stores, mine and railroad and all kindred and interrelated and dependent enterprises which were to be conveyed to Leiter under paragraph six of said will, when he had paid the amount which the same had cost him, as shown by the books, with interest thereon; that the stores and railroad were turned over to Leiter prior to the time he finally purchased them under the decree of December 24, 1924 (*Suffolk v. Leiter, supra*), and while so managing and developing the properties he was not divested or released from his primary duty as trustee; that coal lands adjacent to the mines at Ziegler were purchased and incorporated with the mining properties of the estate, by using the general funds belonging to the corpus of the estate, and partly by using money derived by the Ziegler coal company from operation of mining properties; that townsite lots were sold which Leiter claims was necessary for the development of the mine and the properties; that a reasonable construction of the clause, which gave Leiter the power and placed upon him the duty of developing the mining properties and related industries at Ziegler, would authorize him to purchase necessary contiguous coal lands in order to aid in the development of the original mine, as well as to sell townsite lots, and where a subsequent investigation of mining properties showed the presence of coal in adjoining area that could with profit be utilized, and, from a practical operating viewpoint, necessary, it is not a subject matter of criticism if the estate availed itself of the opportunity of such advantageous purchase, and sale of townsite lots; that all of these transactions were comprehended in the power of development of the mines given to Leiter, and the leasing of said mine to Bell & Zoller Coal Company was consistent with good management and within the power of Leiter, and was

done with the knowledge of the other trustees; that the development of the mine and surrounding properties was attended by great difficulty; that strikes, explosions, riots, and murder followed in the trail of their development, civil war raged in the counties, and made protection and operation of these properties a very difficult task; that in judging and measuring the actions and motives of men as trustees, the scenes under which the actions were performed should always be borne in mind; unusual situations call for unusual action, and after-acquired knowledge, with time for deliberation, is not a safe basis for judging what one should or should not do in an emergency; that the money derived from the operation of the mine, less any necessary expenses, charges, deductions and debts, incurred in the development and operation, was the money of the trust estate, and should have been paid to, or credited to the account of, the trustees in accordance with the terms of the will; that later, when these after-acquired lands were sold to Leiter as part of the entire mining properties, the price or value thereof, if not otherwise repaid to the estate, should have been included in the amount that was paid under the decree of December 24, 1924; that an account should be stated by the Ziegler Coal Company and Leiter for any of the money used in the purchase of these lands, and they must show, by such an account stated, that the estate has not suffered by this transaction, and the burden is upon Leiter to demonstrate this in his account before the master.

That one of the properties of the estate is the store building at Van Buren and State Streets, Chicago, formerly occupied by Siegel, Cooper & Company's general department store; no criticism was made of the actions of Leiter, until after the failure of Siegel-Cooper; this property, up to the time of said failure, had been one of the greatest revenue-producing factors in the estate; that the actions of Leiter in endeavoring

to secure a tenant for said property were prompted by an earnest desire to place the store on an income-producing basis; no matter how much, at a subsequent time, in review of a trustee's actions, one might be inclined to differ with the methods employed to rent this property, yet, as long as they were animated by an honest desire to do his duty, the method employed must be left to the trustee's discretion; he desired to restore this building to a revenue-producing basis as quickly as he could, under the circumstances and situations confronting him, and Leiter and Morris were the only ones who made an active effort to produce this result; none of the other trustees made any tangible suggestion as to the problems involved in placing this vast property on an income-producing basis, or made any effort to find tenants, but contented themselves with waiting until some means were devised and then either disapproving of the plans, or declining to pass on the problems submitted; that the attempts of Leiter and Morris to aid Siegel-Cooper in a financial way and avoid their suspension of business, as well as the incorporation of the Leiter Stores, appear to be also earnest efforts to keep this store building on an income-producing basis.

That the matter of the Wyoming ranch lands presents a problem in which much conflicting evidence was heard; that these lands, located for the most part on the banks of Clear Creek, Wyoming, were originally, and at the testator's death, used for cattle raising; owing to the homesteading of adjoining cattle ranges into farms, the character of the business conducted on these lands necessarily changed, and the trustees tried sheep raising in connection with farming, as well as the growing of small grain; that these lands continued to show a net profit from their operation until 1918, since which time they have shown a loss; that the lands were then divided into smaller farms and rented to tenants; houses and outbuildings were erected for the

use of the tenants in an effort to again put these properties on an income-producing basis, and to make them more available for sale, and elevators were erected in which to store the grain; that for the purpose of conducting farming operations on these lands the water supply for irrigating purposes was not sufficient, and many of the tenants abandoned the farms which were leased to them because of lack of water after the middle of July each year, when their crops would be destroyed for want of irrigating water, which could only be supplied from storage; that the trustees subsequently purchased Lake DeSmet and connected it with the irrigation ditches at the farms in order to supply water for the farms; that it is claimed that this expenditure, and the erection of elevators and tenant houses, were unwarranted and beyond the authority of the trustees, and that the same should be charged against Leiter and Mrs. Campbell personally; that at the time these expenditures were made, the four trustees were Lady Suffolk, Leiter, Mrs. Campbell and Morris; that if this claim was made solely by Lady Suffolk, personally, who absented herself and did not perform the duties which go with the position of trustee, the court would not hesitate in denying this contention, but the minor remaindermen, as well as the minor recipients of the life income cannot be estopped from making this claim; that there is no question as to the good faith and good intentions of the trustees in making these improvements and endeavoring to get water to irrigate these lands; that the general depression throughout the West in all farming activities, which is not confined alone to the State of Wyoming, is, in a large measure, responsible for the present nonproductive state of these properties; that Leiter was confronted with a situation where he had to use his best judgment; no other trustee nor any attorney in fact, made any feasible suggestion as to what should be done in these circumstances; that Lady Suffolk, the

absent trustee, was advised by Leiter as to what he was doing; that sins of omission are quite as great as those of commission, in the work of a trustee, and money can be quite as easily lost by neglect, as by active mismanagement, and a court which desires to be just cannot censure the industrious trustee, who, with good intentions, makes a mistake, and absolve the others who fail to take a part in, or have knowledge of, the duties which the position of trustee casts upon them; that in the years between 1920 and 1927 there occurred in the United States a strange economic phenomenon, in which all city property—some of which this estate possesses—made unprecedented advances in value and in price, and at the same time farm lands depreciated in value to an almost corresponding extent, and the prices of all manufactured articles remained at the war peak, whilst the products of the farm reached such a low level in price that lands were abandoned; that under the terms of the will the trustees are permitted to make improvements upon the real property, but in the purchase of Lake DeSmet any money expended by the trustees for the purpose of furnishing water to lands other than the Leiter properties, was beyond the power of the trustees; that in the hearing to be hereafter had before the master, evidence may be heard as to any expenditures of money upon the Lake DeSmet properties which were expended in contemplation of furnishing water to other than the Leiter properties, and this amount, when determined, will be charged to the trustees.

That one of the charges is that Leiter exercised a dominating influence over the other trustees; that the estate was conveyed to five trustees in its inception—three women and two men, and the mother died in 1913, Lady Suffolk and Mrs. Campbell resided in England, and Lady Suffolk was for five years in India, far away from the scene of action here; that Morris died, and, but for the return of Mrs. Campbell to this coun-

try, Leiter would have been the sole trustee in charge of the manifold duties of this trusteeship; that it is not charged that the removal of the trustees from this country was caused by Leiter, so that it is easy to see how the so-called "dominance" was really thrust upon him by the sequence of events; that the return of Mrs. Campbell to this country made only two trustees that were available; that Lady Suffolk's departure for, and residence in, England was a voluntary act on her part; that such removal was almost the equivalent of abandonment of her duties as trustee under this will; that such removal would also be true as to Mrs. Campbell; that the performance of all the duties of trustee by attorneys in fact was never contemplated by the testator, or that such long distance operation could be successful; that the testator as well as the mother of Leiter had the utmost confidence in Leiter's character, ability, and loyalty to the interests that were given into his charge, and this opinion was shared by Mrs. Campbell and Lady Suffolk until up to about the time of the commencement of these proceedings; that in reviewing the actions of Leiter as trustee, while this court does not yet approve of his actions in several instances (for which this court has ordered him to account), the court is not able to find, throughout his entire stewardship, any dishonest action on his part by which he attempted to profit at the expense of the estate; that the provisions of the will for the appointment of a successor trustee to Morris are ambiguous; that where the will grants the power to the majority of the trustees, the testator speaks of "a majority of the full number of them"; that in granting the power to the trustees to fill vacancies in said trusteeship, the testator, on two different instances, refers to the "remaining trustees"; that had the testator intended that less than all the remaining trustees should select the successor to Morris, he could have easily employed language saying so, as was done when granting the

general power to a majority of the full number of trustees; that since this suit was tried, Warr has died, so that the question of his removal is not now pertinent, and the court is concerned only with the question of his appointment; and that the selection of Warr was not in compliance with the intention of the testator.

In the decree the chancellor, after making the above findings, denied the prayer for the removal of Leiter as trustee and further adjudged that the appointment of Warr by Leiter and Mrs. Campbell was invalid; that the vacancy resulting from the death of Morris had never been filled and appointed Daniel V. Harkin to fill the vacancy and referred the cause to a master in chancery for the following purposes, *inter alia:*

First: To take and state an account between the trustees and the estate, showing the amount expended on the Wyoming property, as to how much, if any, should be charged to corpus and how much, if any, to income, and if any sum is owing to either fund, the plan of repayment, and how much, if any, was expended on Lake DeSmet for the purpose of furnishing water to lands other than this estate.

Second: (a) To take and state an account between Leiter and/or Ziegler Coal Company and the trustees, showing all sums loaned by the trustees to the Ziegler Coal Company; (b) showing all moneys received by Leiter from the coal company for and on account of salary; (c) showing all profits, salaries and dividends received by Leiter through, by or from the operation of the store at Ziegler; (d) showing all profits, salaries and dividends received by Leiter through, by or from the operation of the railroad; (e) showing the profits, if any, made by Leiter in connection with the purchase by him of said railroad and the turning back of the same to the Ziegler Coal Company.

Third: (a) To take and state an account showing all sales made by the Ziegler Coal Company or by Leiter of lands; (b) showing the value on December 24,

1924, and the purchase price of all lands in Franklin and Williamson counties purchased with the funds of the coal company.

Fourth: Take and state an account between the trustees and Leiter in which accounting the master shall charge Leiter with the amount, if any, which has been paid to Leiter out of the funds of the estate created by paragraph four of the will for or on account of traveling and other expenses.

Fifth: To take and state an account in relation to The Leiter Stores and other buildings, showing a proper division of outlay between corpus and income, and recommend a method of reimbursement or amortization from one fund to another; and further adjudged that the court retain jurisdiction over the trust estate under paragraph four of the will and the administration thereof, for the benefit of all persons beneficially interested, and directed that the trustees submit in advance to the court for its approval all matters of policy, including the sale of any real or personal property exceeding $50,000, or the leasing of any real estate for a longer period than ten years.

Counsel for complainant and cross complainants and Leiter and the guardian *ad litem* for Lady Suffolk's children as well as the guardian *ad litem* for the Leiter and Campbell children have each separately filed elaborate briefs and arguments, and, by special agreement, five and one-half days were devoted by counsel to oral argument, discussing the main points relied upon by the respective parties.

The sole question before the court is the correctness of the decree in refusing to remove Leiter as trustee.

Counsel for Leiter contend that the decree is not a final and appealable decree. Complainant's and cross complainants' counsel concede that the decree finally disposed of two of the issues submitted to the chancellor, in decreeing that Leiter be not removed as a trustee and that the appointment of Warr as Morris'

successor was void and appointing Harkin to fill the vacancy. A decree in equity may have the effect of several separate decrees. (*Walker v. Montgomery,* 236 Ill. 244.) When a decree finally fixes the rights of the parties it is final and may be reviewed. (*Bennett v. Weber,* 323 Ill. 283, and cases cited.) An appeal may be taken from that part of a decree which deals with a particular subject, and such an appeal operates as a severance in the trial court of the parties and questions not concerned in the appeal. (*Mussey v. Shaw,* 274 Ill. 351.) The test is, whether the decree or order appealed from determines the ultimate rights of the parties with respect to distinct matters which have no bearing on other matters left for further consideration. (*Hoier v. Kaplan,* 313 Ill. 448.) The chancellor decreed that Leiter as trustee, be not removed and by this decree determined finally the rights of the parties with reference to a definite and separate portion of the subject matter in controversy. The motion to dismiss the appeal is denied.

The specific charges on which it is sought to remove Leiter as trustee, are: (1) that he was hostile toward Lady Suffolk and her representatives and excluded them from participation in transactions relating to the management of the estate; (2) that he attempted to retain control of the estate by the selection of Warr as successor to Morris; (3) his management of the Ziegler properties; (4) that he appropriated to his own use, under the guise of salaries and expenses, money belonging to the estate; (5) that he put the estate in hazardous business enterprises in Wyoming; (6) that he was guilty of wilful and gross mismanagement of the Leiter building; (7) that he sold sound income-producing securities; (8) that he was guilty of flagrant misuse of corporate money for income purposes, and (9) that he committed perjury upon the trial and in matters pertaining to the estate in other jurisdictions.

Whether a trustee should or should not be removed is a question addressed to the sound discretion of the court, and is dependent upon the circumstances of each particular case. (*Haines v. Elliot,* 77 Conn. 247; *Waller v. Hosford,* 152 Ia. 176; *Wylie v. Bushnell,* 277 Ill. 484; *Massey v. Stout,* 4 Del. Ch. 274; *Polk v. Linthicum,* 100 Md. 615.) Pomeroy in his Equity Jurisprudence, Vol. 3, sec. 1086, says:

"The power of courts of equity over the removal and appointment of trustees, independently of any statutory authority, or any directions in the instrument of trust, is well established. . . . The exercise of this function by a court of equity belongs to what is called its sound judicial discretion, and is not controlled by positive rules, except that the discretion must not be abused."

The power to remove a trustee appointed by will is exercised sparingly; there must be a clear necessity for the court's interference; to justify removal it must appear that it is clearly necessary in order to assure the safety of the trust property in the future. (*Waterman v. Alden,* 144 Ill. 90; *Wylie v. Bushnell, supra; Haines v. Elliot, supra; Starr v. Wiley,* 99 N. J. Eq. 79; *Massey v. Stout,* 4 Del. Ch. 274.) All that a court requires from a trustee are common skill, common prudence, and common caution and honest exercise of a discretionary power, in the absence of supine negligence or wilful default. (*Waterman v. Alden, supra; Cowles v. Morris & Co.,* 330 Ill. 11; *Lathrop v. Smalley's Executors,* 23 N. J. Eq. 192; *In re Detre's Estate,* 273 Pa. 341.)

With these rules in mind we proceed to a consideration of the specific charges. Lady Suffolk's counsel argue (1) that Leiter was hostile toward Lady Suffolk and her representatives and excluded them from participation in important transactions relating to the management of the trust estate, and (2) that he attempted to retain control of the estate by the selection

of Warr as successor to Morris, and, therefore, should be removed. Courts of equity have the power to remove a trustee whenever such a state of mutual ill-will exists between the trustees that his continuation in office will be detrimental to the execution of the trust. (*May v. May,* 167 U. S. 310, 321, and *Yates v. Yates,* 255 Ill. 66, 72.) The chancellor found that Leiter at times had shown his displeasure of Lady Suffolk and at times brotherly affection to a marked degree; that if Leiter had shown any antagonism toward her it was because he resented the charges made by the beneficiaries residing in England, who were receiving the income while he really worked and produced the income, and that the differences were not so great as to materially endanger the estate. From our examination of the evidence we are convinced that until the death of Morris in 1921, and the resulting controversy over the appointment of a successor trustee, the relations between Leiter and his sister were affectionate. This affection was destroyed as a result of the Warr controversy and the filing of the bill in this cause. Mere disagreements between the trustees and the *cestuis que trust* will not justify a removal. (*Wylie v. Bushnell, supra; Lorenz v. Weller,* 267 Ill. 230, 243; *Teater v. Salander,* 305 Ill. 17; *Wilson v. Smoot,* 186 Ky. 194, 216 S. W. 129.) In the case of *Smith v. Heyward,* 115 S. C. 145, 164, the court said:

"The mere fact that executors or trustees do not or cannot agree as to the administration of their trust has never been considered sufficient ground for the removal of one or all of them. . . . Dissension amongst them may be expected, and, in some cases, it may be desirable, since it may result in advantage to the estate."

We have carefully examined the testimony and find that Lady Suffolk's participation in the management of the estate was through her attorney in fact, and that the relations between the trustees and her attorney in

fact have not become so hostile as to defeat the purposes which the testator had in mind when he created the trust, and that there is nothing in the record which will prevent her present attorney in fact and the trustees from co-operating efficiently. Nor do we believe that Leiter should be removed because he and Mrs. Campbell selected Warr as successor to Morris. There was a doubt as to whether Leiter and Mrs. Campbell had the power to appoint a successor to Morris, and they acted in good faith on advice of counsel and believed they had the right to select Morris' successor. The disputed question having been disposed of, the existence of the hostility can no longer be asserted as a ground for removal. (*Berry v. Williamson,* 50 Ky. 245; *In re Ward's Estate,* 175 N. Y. S. 655; *Cornett v. West,* 102 Wash. 254, 264.) This dispute having been adjusted, there is nothing to prevent the parties from future harmonious co-operation in the management of the estate, and the parties should keep in mind that the duty of preserving harmony rests alike on all the trustees.

It is contended (3) that Leiter mismanaged the Ziegler properties and appropriated funds in connection with such management and, therefore, should be removed. The sixth clause of the will of the testator gave his Franklin county coal lands and his Universal Fuel Company stock to the trustees named in the fourth clause of the will, in trust, to hold them, either directly or through ownership of the stock of a corporation, which the testator provided might be organized, for the purpose of owning and operating the coal lands, until Leiter should repay the testator's estate the amount invested by the testator in the coal lands and Universal Fuel Company, with interest thereon. The trustees were directed to permit Leiter to manage and control the lands and mines; the rents, profits and dividends, after the payment of all operating expenses, were to be paid over to the trustees and applied as a

credit by them to the amount of money invested in the coal lands and stock, but the testator made no provision as to what should be done with the losses, or how necessary capital should be provided for operating the mine which was already in existence and operation at the time of the testator's death. Leiter continued the operation and development of the mine,— the circumstances and conditions under which he did so being as above stated in the decree. He did not pay over the issues and profits nor did he make any payment on the purchase price until the decree of December 24, 1924, was entered (*Suffolk v. Leiter, supra*), and by that decree he was permitted to acquire the properties. Leiter, individually, was not required to undertake the management and control of the coal properties. He was given an option to purchase and acquire the property upon the terms set forth in the sixth clause of the will, which he could exercise or not, as he pleased, but until he did, and made the payment, the title and right to any income derived belonged to the estate. While operating the coal properties he purchased, by using the general funds belonging to the corpus of the estate and partly by using money derived by the Ziegler Coal Company from the operation of the mining properties, other coal lands, contiguous to those already possessed, which were incorporated with the mining properties of the estate, and sold townsite lots; he claims this was necessary in the proper development of the properties as an entire entity.

Leiter, after he elected to acquire the properties, on December 24, 1924, paid to the trustees, under the fourth clause of the will, $1,034,534.68 principal, and $1,004,214.33 interest, or a total of $2,038,749.01, and the properties were conveyed to his nominee. This amount represented the sum that the trustees were entitled to receive in exchange for the Ziegler properties under the terms of the will. No objection was made by Lady Suffolk nor any of the guardians *ad*

*litem* to the acceptance of this payment. The court in the *Suffolk v. Leiter* case, *supra,* held that Leiter acted entirely within his rights in allowing 20 years to elapse before he paid anything to the trustees toward the acquisition of the coal property. This delay in paying the testator's advances, with interest, worked to the advantage of the remaindermen and it increased the corpus of the estate. The testimony not establishing want of integrity on the part of Leiter, and the chancellor finding that throughout Leiter's entire stewardship he had not been guilty of any dishonest act nor had he attempted to profit at the expense of the estate, and the estate not having been endangered, we believe that the chancellor has not abused the sound judicial discretion vested in him, in decreeing that Leiter's management of the Ziegler properties was not grounds for his removal.

It is contended (4) that Leiter, under the guise of salaries and expenses, appropriated to his own use moneys belonging to the estate. In the early years of the administration of the estate he paid himself a salary for his services as trustee,—his mother and Mrs. Campbell consenting to this payment. At a meeting of the trustees held December 3, 1906, the legality of his receiving a salary was questioned and a resolution was adopted that the money theretofore received by him as salary be charged against his income account, and this was done. Thereafter he received $5,000 per annum from his mother and a like sum from Mrs. Campbell, who later paid him $6,000 per annum. During this period and up to January 1, 1920, he made many trips between Washington, Chicago, Ziegler and Wyoming on estate business. He maintained an apartment in Chicago. The vast amount of estate property in Chicago required his frequent presence here and during this period he made no charge against the estate for his expenses. At a trustees' meeting held on December 20, 1920, attended by Mrs. Campbell,

Morris, Wilson and Leiter, it was proposed that Leiter be reimbursed for his traveling and other expenses. Wilson said he saw no objection to the repayment of Leiter's expenses incurred in connection with the estate business. It was then ascertained from the accounting records that Leiter's expenses from January 1 to December 20, 1920, amounted to $11,554.91, and a motion was adopted that Leiter thereafter be paid $1,000 a month for expenses; that thereafter during the life of Morris monthly checks for this item were signed by Morris and given to Leiter without any showing as to the amounts actually expended by him. Upon this state of the record the chancellor held that the items of expense paid to Leiter in a lump sum must be segregated and itemized and credit taken in his account only for actual, necessary expenditures for the benefit of the estate. The chancellor did not err and these facts would not warrant his removal as trustee.

It is claimed (5) that Leiter, without authority from the will, put the estate in hazardous business enterprises in Wyoming at great financial loss, and wasted vast sums in land colonization schemes and irrigation projects. The testator was a partner in extensive ranch properties in Wyoming. The largest unit, which is the principal subject of this controversy, extends about 26 miles along Clear Creek, a semi-arid, sparsely settled region. This property was originally owned by Pratt & Ferris Cattle Company, a copartnership. Some time prior to 1889, Ferris sold his interest to Marshall Field and the testator; in 1899, Field sold his interest to the testator, and at the time of the testator's death the Clear Creek lands embraced five ranches containing 13,385 acres, used principally as cattle ranches. Neither the lands nor the cattle business was mentioned in the testator's will, nor was any provision made for carrying on that or any other business, nor for developing the lands. The testator's

interest in these properties came to the trustees as part of the general residuary estate under the fourth clause of the will, subject to the powers of the trustees therein expressed. In 1904, after the death of the testator, proceedings were instituted for the partition of the property. Commissioners were appointed to set aside and value parcels of land representing the interests of each member of the partnership. The commissioners awarded to the estate the Clear Creek lands and determined this at a value of $227,085. On June 6, 1905, Leiter advised the trustees he had commenced the purchase of sheep and would continue until the full quota authorized at the last meeting of the trustees had been purchased. In a report dated August 14, 1905, he reported he had purchased 24,000 head of sheep. The sheep enterprise continued to about June, 1907, when Wilson objected, saying it was putting the trustees in business. Morris, in a letter to Mrs. Campbell in February, 1906, wrote that the raising of sheep is quite hazardous, and doubted whether it was in the power of the trustees or wise for them to continue in that kind of business. Following the sheep venture and until 1915, the ranges were leased out to various tenants.

In the autumn of 1904, Mrs. Leiter, Lady Suffolk, Mrs. Campbell and Leiter visited the Wyoming properties; they discussed the question as to whether or not the ranges should be disposed of and all of them agreed that they should be retained and not sold. At a meeting of the trustees on December 1, 1909, attended by Mrs. Campbell, Wilson, Morris and Leiter, a resolution was adopted that Leiter be given authority until January 1, 1911, to sell the Clear Creek lands for not less than $800,000. This was the only sum for which the trustees ever authorized the sale of the range properties. The only practical use to which the ranges could be put after 1916, was to divide them into small farms and sell for farming. In June of 1924, Lady

Suffolk's attorney in fact wrote to Leiter that in his opinion it would require a colonization scheme to dispose of the range properties.

A shortage in the flowage water of Clear Creek usually developed about July 10, and it is necessary to have reserve water to obtain successful crops on these properties. In 1897, the testator investigated reservoir sites with a view of attempting to secure stored water. In 1911, hydraulic and irrigation engineers were employed to investigate reservoir sites in the vicinity of these properties, with a view to obtaining a reservoir for the storage of water; in their report they stated that the lands were traversed by one of the main lines of the C. B. & Q. Ry. Co.'s system and that a market for the crops was assured and there seemed to be no reason why irrigable lands should not eventually be worth at least $100 an acre, provided a sufficient supply of water was furnished the lands, and they recommended Lake DeSmet as the best reservoir site for the estate to acquire. Lake DeSmet was recognized by ranchmen and business men as a desirable reservoir. Leiter investigated the Lake DeSmet reservoir and found that one Reed had a contract to purchase Lake DeSmet. Subsequently the trustees employed an engineer to make a further search and he made his report and recommendation, but the sites he reported on were not regarded as favorable. On April 29, 1916, Edward Gillett, who laid out the Burlington railway, advised Leiter that the estate would be able to obtain a sufficient water supply from Lake DeSmet cheaper and better than the water could be acquired from any other source, and urged him to acquire Lake DeSmet in order to increase the value of the land and secure a good crop each year. In July of 1918, Leiter went out to the ranches and found no water in Clear Creek. In 1919 the estate could draw no water out of Clear Creek and agricultural conditions were much depressed, due to the insufficiency of water. In the latter

part of 1918, Reed died, and his executors advised Leiter they would sell the Lake DeSmet site for $20,000. Leiter took the matter up with Morris and wrote to Wilson regarding this site and desired his concurrence in the expenditure. A formal offer in writing was made to sell to the estate the Lake DeSmet site for $20,000, which was reported to the trustees at a meeting attended by Leiter, Morris, and Mrs. Campbell on October 19, 1919. At this meeting the trustees present deemed it advisable to accept the offer and Leiter was authorized to complete the purchase. Prior to the acquisition of the DeSmet reservoir, Morris and Leiter reached the conclusion as to the best use to which the ranges could be devoted, and were of the opinion that if the land could have an adequate supply of water it would sell for higher prices and that in order to sell, it would be necessary to build houses and barns. The question of the construction of grain elevators came up for discussion among the trustees. Figures were submitted and experts were consulted. The estate constructed three elevators. There was considerable conflicting testimony as to the necessity for the building of these elevators, and conflicting evidence was heard as to whether or not the value of the land had increased by reason of the Lake DeSmet reservoir.

On May 18, 1918, Leiter advised Lady Suffolk's London solicitor that he was building further tenant houses in Wyoming and that it would be necessary to build storage reservoirs in connection with the irrigation system in order to provide for irrigating water after the flow of streams had decreased in late July and August. Lady Suffolk received semiannual auditor's reports which disclosed the Wyoming expenditures, but did not make any suggestion either to Leiter or the other trustees that the expenditures be curtailed or that an attempt be made to sell the lands. Mrs. Campbell approved the plan of subdividing the

lands into small areas for cultivation and considered it the only possible means of renting the lands; and she discussed the plan for the construction of the Lake DeSmet reservoir with Morris who considered the acquisition of this reservoir site essential, and approved the acquisition of the reservoir site and the manner in which the reservoir was constructed. At a meeting of the trustees held June 1, 1921, attended by Lady Suffolk, the expenditures incurred in connection with Lake DeSmet were discussed and the minutes do not show that she made any objection thereto. At this meeting Leiter stated that a total of $190,851 had been expended, and Wilson asked what further obligations the trustees would be required to meet and Leiter replied that there would be no further expenditures during the year except three substantial pay rolls. The total cost of the Lake DeSmet project on December 31, 1925, was $340,184.65. Neither Lady Suffolk nor Wilson criticised any of the expenditures discussed at the meeting of June 1, 1921.

From 1915 to 1925, $1,025,166.96 was expended in connection with these projects, all of which has been charged to corpus and stands today as a capital investment; in addition thereto, from June 30, 1919, to December 31, 1925, over $420,000 was advanced out of corpus for operating advances to Wyoming, of which amount so advanced there was still owing credits from income on December 31, 1925, over $264,000, and over $273,000 on June 30, 1926.

No charge is made that Leiter misappropriated funds or profited personally by reason of what he did, nor that he was prompted by any improper motives. A trustee, in the investment of the funds of the estate, must act in good faith, use sound discretion and reasonable vigilance. (*White v. Sherman,* 168 Ill. 589, 601.) He has no right to employ trust funds in a private business, even though such investment is approved of by his own judgment, and is made with honest intent.

(*Penn v. Fogler,* 182 Ill. 76, 103.). He has not the freedom of choice in investments that may be exercised by prudent business men in their own affairs. (*Merchants Loan & Trust Co. v. Northern Trust Co.,* 250 Ill. 86, 89.) In the case of *Waterman v. Alden,* 42 Ill. App. 294, in which the removal of a testamentary trustee was refused, the court said, page 316:

"It is not strange, considering the size and character and situation of the estate, that some things could be found in its management that would be open to just criticism, and such is the fact in this case; but the same thing would be true of an ordinary person managing an estate of his own of like character and extent. These men are not to be judged by a standard of perfection which would insure the best results. It is sufficient if they have exercised reasonable care and prudence. In what has been said we have noticed everything in their conduct and management of the estate which seems worthy of attention and find nothing to require or authorize their removal as trustees, or to lead us to believe that any ordinary business men under like circumstances would do any better if substituted in their places."

The law requires that a trustee must act in good faith in the management of all matters relating to the trust, and employ such vigilance, sagacity and diligence as prudent men of intelligence ordinarily employ in their own affairs. A trustee who in an honest effort to serve his trust errs in his judgment will not be condemned. If the rule were otherwise, it would not be possible to induce any person to act as trustee and assume the risk of losses which might result from mistakes of judgment. In Vol. 1 of Perry on Trusts and Trustees, 7th Ed. sec. 276, it is said: "If a trustee fails in the discharge of his duties from an honest mistake or mere misunderstanding of them, or from a misjudgment, it is no ground for removal."

See also *Waterman v. Alden,* 144 Ill. 90; *Wylie v. Bushnell,* 277 Ill. 484; *Cowles v. Morris & Co.,* 330 Ill. 11; *Brown v. Cleveland Trust Co.,* 233 N. Y. 399, 405; *Lathrop v. Smalley's Executors,* 23 N. J. Eq. 192; *Preston v. Wilcox,* 38 Mich. 578; *Thompson v. Hays,* 11 F. (2d) 244; *In re Allis' Estate,* 191 Wis. 23, and Pomeroy's Equity Jurisprudence, 3rd Ed. sec. 1070. To remove a trustee there must be a clear necessity for such an order—a clear necessity to save the trust property. Mere error, or even breach of trust may not be sufficient; there must be such misconduct as to show want of capacity or of fidelity. We find no necessity for such action and the chancellor did not abuse the judicial discretion vested in him, in decreeing that Leiter's management of the Wyoming properties was not grounds for his removal as trustee.

It is next contended (6) that Leiter should be removed as trustee because of his wilful, gross mismanagement of the Leiter Building. This building, known as the Siegel-Cooper Building, and later as the Leiter Building, was commenced by the testator in 1891, and was finished in 1893. It is located at the southeast corner of State and Van Buren Streets, Chicago, eight stories and basement in height and is 400 feet long and 142 feet deep. It was erected for use as a department store and was carried on the books of the trustees at over $3,000,000, exclusive of certain expenditures made after the death of the testator, for alterations and improvements. It was leased to Siegel-Cooper in 1893, and was used by it for the operation of a department store to 1918. In 1908, a lease was made by the trustees with Siegel-Cooper for 20 years commencing March 1, 1912, at a rental of $250,000 per year for the first five years; $275,000 per year for the second five years, and $300,000 for the last 10 years. In 1914, Siegel-Cooper became involved in financial difficulties, and its business was ultimately liquidated and the building was

vacated in May, 1918. In 1914, Leiter was in Europe and Morris wrote him regarding Siegel-Cooper's financial troubles; that the estate could not afford to have the store on its hands without rental; that a plan of reorganization had been prepared and that, with the consent of Wilson and Platt, he had agreed to put in $100,000 for the purchase of preferred stock of Siegel-Cooper. On March 4, 1914, Morris wrote again that he was endeavoring to raise $1,000,000 from outside subscribers to rehabilitate the business and that he had agreed on behalf of the trustees to contribute $150,000 to the reorganization. While Siegel-Cooper was in this precarious financial condition, Leiter tried to induce some concern of financial means to buy the business. He interviewed and had negotiations with many of them. After much effort and many difficulties, the building was reopened as The Leiter Stores with 117 tenants, who leased space on a square foot basis and later on a percentage sales basis. Lady Suffolk and Lord Curzon were informed of Leiter's efforts and the difficulties being encountered.

It is impossible for us to discuss in detail the evidence in this record relative to the actions and conduct of Leiter by which he endeavored to secure a tenant for this building, but after a careful and patient study of the entire record, we agree with the chancellor, that Leiter was prompted by an earnest desire to place the store on an income-producing basis. Applying the rules before stated that the law requires a trustee to act in good faith in the management of all matters relating to his trust and use such vigilance and sagacity as prudent men of intelligence employ in their own affairs, and that the imprudence or neglect of a trustee is generally ground for requiring him to make good the injury resulting from it rather than for superseding him (*Preston v. Wilcox*, 38 Mich. 578), we have arrived at the conclusion that the chancellor did not err in

directing that Leiter's management of the Leiter building was not grounds for his removal as trustee.

We now proceed to consider the charge (7) that Leiter should be removed because he sold Commonwealth Edison and Pullman stocks. On December 24, 1920, the estate was the owner of 7,626 shares of the Commonwealth Edison and 5,222 shares of Pullman stock. Morris, who had charge of the estate's income tax matters, suggested that it would be advisable to sell some of the Edison and Pullman stocks so as to establish income tax losses for 1920 to counteract the profits made in connection with the sale of Platte River land at prices in advance of their cost as determined in the Wyoming partition proceedings, and the estate sold 1,100 shares of Edison stock for $111,114, and 16,000 shares of Pullman stock for $159,476.50. Subsequent events established that Morris was partially wrong in his conclusions regarding the determination of profits and losses under the 1918 Revenue Act then in force. The Platte River lands were sold on the instalment plan, and upon an audit of the 1920 return the department held that only $4,687.54 of the profits made in the sale of the Platte River lands was applicable to the year 1920. These stocks were sold on the exchange at the prevailing prices on the date of sale. No complaint is made regarding the price obtained, but the charge is that the stocks were high-grade investments, and were sold by Leiter in order to obtain funds to invest in hazardous and speculative enterprises, to the loss of the trust estate. The record shows that $260,000 of the proceeds of these sales were used to pay estate loans at the Merchants Loan & Trust Company. These stocks were not the only securities sold by the estate.

The sales of securities by the estate were all shown in the semiannual auditor's reports, which were sent to the trustees and the beneficiaries of the estate. The

sale of the Edison and Pullman stocks was disclosed in the auditor's report for the period ending December 30, 1920. No objection was ever made to these sales until the filing of the cross-bill. We have carefully considered the evidence on this phase of the case and find no cause for the removal of Leiter, as trustee.

It is next claimed (8) that Leiter was guilty of a flagrant misuse of corpus money of the estate for income purposes and, therefore, should be removed. The bill of complaint charged that moneys belonging to the trust estate had been expended for keeping buildings in proper repair, which were properly chargeable to the income, but which had been charged to corpus, and that such improper charges had been made in order that the income received by the life tenants might be increased at the expense of the remaindermen and that *an accounting is necessary* under the direction of the court to determine how such charges should properly be allocated. Under the testator's will the trustees may borrow money, and secure the payment thereof by mortgage or trust deed on any of the real estate, to pay incumbrances or to make improvements on any of the property held by them under the trust, and they may use such portions of the net income as they deem best, either to pay mortgages or incumbrances upon the trust property or in making improvements thereon. The trustees are required to pay out of the income of the estate all the expenses of management, including taxes and assessments of every sort, insurance and repairs, but no authority is conferred upon them to use any part of the corpus for income purposes; whenever the trustees make improvements to the real estate it is optional with them to use corpus or income for such purpose as they deem best.

After the death of Mrs. Leiter, an accounting by the trustees was had before the Supreme Court of the District of Columbia, in which all of the parties, including the life tenants as well as the remaindermen,

were represented, the minors being represented by a guardian *ad litem,* and all transactions and accounts of the trustees from June 9, 1904 (the date of the testator's death), to March 6, 1913, were approved. Semiannual audits of the trustees' accounts were made every six months by certified public accountants and copies of such auditor's reports were mailed to each of the trustees and to each of the life tenants of the estate. These reports contained balance sheets divided as between principal and income so that an examination of the reports disclosed what had been charged to corpus and what items had been charged to income, and showed in detail all moneys disbursed by the estate, including expenditures for improvements to real estate.

When Morris took up his duties as trustee he brought to the estate office E. A. Bronson who has been in the employ of the estate ever since. Bronson had complete charge of the estate accounting records, and the estate records kept under his direction disclosed all expenditures made by the estate and the manner in which the same were charged. Most of the expenditures on improvements to real estate which were charged to corpus, and concerning which questions are now raised, were made prior to 1913. These included the sum of $350,000 expended for the improvement of the Leiter Building at the time of the execution of the lease to Siegel-Cooper in 1908.

The auditor's reports filed in the accounting proceeding in the Supreme Court of the District of Columbia discussed at length the improvements and betterments to properties comprised within the corpus of the estate. The report stated that the improvements in question were ordinary items of maintenance and replacement such as would be chargeable out of the immediate income; that the will authorized and empowered the trustees to use the net income in their discretion in the making of improvements upon any

property held in trust by them under the will; that this section was not mandatory and was no doubt intended by the testator to place the trustees in a position to exercise a certain discretion with due consideration both as to the life beneficiaries and the remaindermen; that the policy adopted by the trustees was favorable to the remaindermen and that it was hard to conceive how a more just application of the trustees' discretion could have been made; that the policy initiated by the trustees in allocating expenditures made for the improvements was fair and equitable. It further stated that in connection with the Leiter Building it became necessary for the trustees to make certain changes in the building which were demanded by Siegel-Cooper, as a condition precedent to the execution of the lease; that these additions and improvements consisted of the erection of four stories over a courtyard, additional stairways and certain structural changes; and that the actions of the trustees in making these improvements appear to have been the result of their desire to carry out the general intent of the testator under the guidance of their able business associate and co-trustee Morris.

The policy of the trustees in apportioning charges as between corpus and income was the subject of a lengthy discussion at an informal trustees' meeting held on February 7, 1924, attended by Leiter, Warr and Mr. Johnson (counsel for Lady Suffolk), Bond, Bronson and Gilchrist of Haskins & Sells (certified public accountants). A report by Haskins & Sells considered at that meeting showed an indebtedness of income to corpus in the amount of $530,000. In explaining the nature of this item to Johnson, Platt referred to the expenditures made in order to obtain a lease for the Leiter Building and said that this amount, under his advice, was going to be amortized as an expense over the period of the lease, on the theory that it was through this expenditure that the lease was obtained

and the building rendered productive; that while the amount should be paid out of income and not out of corpus, manifestly it would be to the advantage of everybody concerned that instead of taking the amount of the expenditure out of income in one year, to take it from income over a period during which the advantage resulting from the expenditure was being derived; that the plan adopted was to amortize the expenditure over a period of 20 years, charging one-twentieth of the amount to income and crediting the same to corpus during each year, but that this amount should not be definitely fixed on account of the percentage basis of the rental for the Leiter Building and that a large amount ought to be amortized during the years when the rental is high rather than when it is low.

The total value of the corpus of the Leiter estate on June 9, 1904, was $12,920,948.67. On June 30, 1926, that value had increased to $17,387,693.38.

In the decree appealed from the chancellor found that the question of allocation of expenditures between corpus and income, the rate of amortization of moneys already expended for repairs, permanent improvements, etc., and the determination of the question whether such improvements resulted in a benefit to corpus or merely increased income, would have to be the subject of an accounting before a master, and he decreed that the cause be referred to a master for the purpose, among others, of taking and stating an account in relation to the Leiter Building and other buildings showing a proper division of outlay between corpus and income and to recommend a method of reimbursement or amortization from one fund to the other.

We have examined the testimony and considered the arguments of counsel and are of the opinion that the chancellor did not abuse the discretion vested in him in holding that Leiter's conduct in the use of corpus

money of the estate for income purposes was not grounds for his removal.

There remains to be considered the charge (9) that Leiter committed perjury upon the trial, and in matters pertaining to the estate in other jurisdictions. It is based upon the claim of inconsistent testimony on controverted questions in the instant case, and statements made before the Interstate Commerce Commission. We have examined the evidence and are convinced that it does not sustain the contention made.

Leiter has administered for more than 26 years an estate received from his father amounting to $12,920,948.67, which has been increased under his management to $17,387,693.38. The net income earned by the estate from June 9, 1904, to June 30, 1926, amounted to $13,848,882.58. Leiter is of abundant means, no question being raised as to his solvency. He has not been shown to be a person unfit for the execution of his office, and there is nothing to indicate that his retention as trustee will jeopardize the estate. It must be borne in mind that the testator and Mrs. Leiter, as well as Mrs. Campbell, reposed great confidence in him. The testator was thoroughly familiar with his son's ability to manage the testator's estate, and his wishes should be regarded. The interests of the *cestuis que trust* should always receive consideration and protection. It was for their benefit the trust was created, and it is the duty of the court to see that their rights are not jeopardized. There are now three trustees, Leiter, Lady Suffolk and Daniel V. Harkin, with equal powers. Leiter without the concurrence of one of the other trustees can do nothing, in our opinion, to jeopardize the estate. This gives the remaindermen all necessary protection that the testator had in mind. It should be noted that the children of Mrs. Campbell and Leiter are satisfied with the management of the estate, and strenuously urge by their guardian *ad litem* that Leiter be retained as a trustee.

After reviewing the contentions and arguments of counsel and considering the evidence, our conclusion is that the chancellor did not abuse the discretion vested in him in refusing to remove Joseph Leiter as trustee. Accordingly the decree appealed from will be affirmed.

*Affirmed.*

SCANLAN, P. J., and GRIDLEY, J., concur.